54 A.3d 281

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. BARTHOLOMEW P. MCINERNEY,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 9, 2012—Decided October 10, 2012.

Before Judges PARRILLO, GRALL and ALVAREZ.

*Edward C. Bertucio* argued the cause for appellant (*Hobbie, Corrigan, & Bertucio,* attorneys; *Norman M. Hobbie* and *Mr. Bertucio,* of counsel; *Mr. Bertucio,* on the briefs).

*Carey J. Huff,* Assistant Prosecutor, argued the cause for respondent (*Peter E. Warshaw, Jr.,* Monmouth County Prosecutor, attorney; *Mr. Huff,* of counsel and on the brief).

PER CURIAM.

A jury found defendant Bartholomew P. McInerney, a high school baseball coach, guilty of endangering the welfare of ten children under the age of eighteen, a crime of the second degree defined in subsection a of *N.J.S.A.* 2C:24–4.[1] The judge sentenced him to three consecutive six-year terms of imprisonment and seven concurrent five-year terms.

This second-degree crime applies only to a "person having a legal duty for the care of a child or who has assumed responsibility for the care of a child." *N.J.S.A.* 2C:24–4a. Although the evidence was adequate to permit the jury to conclude that defendant "assumed responsibility for the care of" each child, the jury instruction on the meaning of that phrase was inadequate and contradictory. The flaws are attributable to the incorporation of definitions of abuse and neglect that equate paid and volunteer members of a school staff with parents and custodians, effectively enlarging the class of persons to whom the second-degree crime applies. The erroneous instruction requires a new trial. To avoid repetition of the error, we urge the Supreme Court's Committee on Model Criminal Jury Charges to clarify the *Model Jury Charge (Criminal),* "Endangering the Welfare of a Child (Second Degree)" (Nov. 10, 2003) (hereinafter the Model Charge).

---

[1] The indictment included two additional counts charging second-degree endangering. The judge dismissed one count at the close of the State's case, and the jury found defendant not guilty of the other.

I

Except for a one season hiatus from June 2005 to March 2007, defendant was the coach of a Catholic high school varsity baseball team and head of the school's baseball program from 1994 until November 2007. He left the position when he was arrested for this crime and complied with the principal's request that he refrain from coming onto school property or speaking with the students.

As head coach, defendant was responsible for the "overall development" of the school's baseball program. He supervised the assistant coaches assigned to the freshman and junior varsity teams and was expected to monitor the "performance of the players in the lower teams" to assess their potential for moving to the varsity level. Some of the players were moved up to varsity while they were freshmen and sophomores. During defendant's tenure, the varsity team won a State championship.

Although the baseball season starts in March and ends in May or June, depending on a team's success in post-season tournaments, defendant frequently came to the high school in the off season. He attended to his other responsibilities, which included fundraising for the baseball program and scheduling games for the next season. Because the high school did not have playing fields, defendant also had to arrange for his teams to practice and compete elsewhere. In addition, defendant came to the high school to work out in the gym, visit with teachers and other coaches and keep score at basketball games. Defendant's brother coached the soccer team, and defendant attended its games as well.

Although high school coaches are subject to rules that preclude off-season coaching, defendant was involved with the baseball players most of the year and expected his players to be involved all year as well. He organized summer and fall leagues in which his high school's students played, and he attended practices and games. He also managed a recreational softball league, and some of his team members assisted him with this.

On several occasions, defendant traveled out-of-state with members of the high school baseball and soccer teams. During Easter break, members of the baseball team participated in tournaments in Hawaii, Alaska, and North Carolina, even though the rules of the diocese precluded the high school from supporting trips that required airplane travel and the team could not use the high school's name.

Defendant spent time with team members outside of organized baseball. For example, he took select players who were Mets fans on weekend trips to see games played in cities like Boston and Chicago; met with a boy who was thinking about coming to his high school to play baseball at his home; regularly allowed players to stop at his home; hosted a party for a player who was offered a baseball scholarship to a prestigious university; and offered to drive students to their homes after sporting events. Defendant and his brother also had a t-shirt and uniform business, and one member of his brother's soccer team worked there. That soccer player traveled with the baseball team to an out-of-state tournament. Defendant also played tennis with team members in his free time.

Furthermore, defendant involved himself in the lives of the players in matters unrelated to sports. One of the victims called defendant after midnight because he had consumed too much alcohol to drive; defendant picked up the boy and drove him to his girlfriend's home. The boy called defendant because he did not want his parents to know he was drinking and defendant had offered to do that for his players. Another victim whose drinking brought him to the attention of the police came to defendant for assistance, and he intervened. After the incident, defendant directed that boy to call him every time he returned home from a night out for one month. Defendant also gave the boys money when they asked, and he bought some of them sneakers. Several of the victims kept in contact with him after they graduated, even those who attended college away from home.

The endangering charges were based on defendant's supervision and direction of the boys in matters unrelated to sports or alcohol consumption. The ten boys gave similar accounts of that conduct. Defendant would approach a player individually by speaking to him after practice, while giving him a ride, at his home, on the tennis court or on a field-trip.

Defendant would begin a conversation about "behaving" by asking the boy about alcohol and drugs and moving on to inquire about the boy's sexual behavior. He would ask whether the boy had a girlfriend and question him about the extent of their sexual activity. He cautioned about unplanned pregnancy and the impact it would have on the boy's life, asked if the boy understood how pregnancy occurred and knew how to avoid it, and he encouraged abstinence. Defendant also directed the boys to reduce the risk of failing to abstain by masturbating, asked if they had done it and how, and instructed them on means and methods.

To encourage the practice of that behavior and monitor the boys' compliance, defendant paid them to send him reports by telephone, instant message or text message. He told the boys the messages were important to him because when he received them he would know they were behaving and not "worry" about them failing to abstain. He gave them directions on how to send reports indicating the duration and quality of the experience and the volume of ejaculate, phrased so that only they would understand. Records of cell phones used by defendant and the boys reflected the frequency of text messages sent by the boys to defendant from April through November 2007.

Defendant also urged the boys to use condoms during masturbation and in the event of failure to remain abstinent. He supplied the condoms, and he directed some of the boys to bring him the used condoms for inspection, which some of them did. When defendant gave condoms to a boy, he directed him not to identify defendant as the source if someone else found them.

Finally, defendant asked some of the boys to video record their masturbation and lent them his camera. Defendant gave the boys

various explanations for that suggestion and offered rewards such as money and tickets to professional games. When those who complied gave defendant the tape, he destroyed it in their presence without viewing it, as he had promised he would. Defendant also took the camera on one of the out-of-state trips; there he approached boys and offered to leave his room so the boy could make a recording.

When defendant first broached the topic of sexuality with the boys, three of them were younger than sixteen and the others were sixteen or seventeen. Some of the conversations took place outside New Jersey, and in some instances the conversations, texts and supplying of condoms continued after a boy's eighteenth birthday and after the boy left for college.

Defendant's supervision of the several victims' sexual behavior took place during various timeframes. The shortest of the periods was about five months, and the longest was about two years.

School authorities were unaware of any problem with defendant's behavior prior to November 2007. On one occasion prior to November 2007, the athletic director had a conversation with defendant about perceptions of his favoritism toward some of the athletes, but he did not view the situation as one calling for a reprimand. The school required the coaches to take a course on protecting children from abuse by predators, and the athletic director had told them not to meet with students alone or host events that did not include all members of a team.

At trial, defendant admitted having frank and probing sexual conversations with the boys, but he claimed to have done so only to encourage masturbation as a safe substitute for intercourse and to assure the boys that they were developing normally. He questioned the boys regarding their sexuality, and did so persistently at times, solely because he understood how difficult it was for them to discuss the topic with their parents. He denied that the conversations and payments relating to masturbation were motivated by anything other than giving the boys a safe outlet. As defendant explained, "These were the players that I coached.

These were the kids that I cared about, the kids that I loved. The kids that I wanted to succeed with their lives. . . ."

On appeal defendant raises the following issues:

POINT I

DEFENDANT DID NOT FALL UNDER THE LEGAL DEFINITION OF A PERSON HAVING A "LEGAL DUTY" OR THE LEGAL DEFINITION OF SOMEONE WHO "ASSUMED RESPONSIBILITY" FOR THE CARE OF THE ALLEGED VICTIMS. THEREFORE, THE PRE–TRIAL, TRIAL, AND POST–VERDICT MOTIONS TO DISMISS ALL COUNTS OF THE INDICT-MENT ALLEGING VICTIMS BETWEEN SIXTEEN AND EIGHTEEN SHOULD HAVE BEEN GRANTED AND THE COUNTS INVOLVING AL-LEGED VICTIMS UNDER SIXTEEN SHOULD HAVE BEEN REDUCED TO THIRD–DEGREE ENDANGERING THE WELFARE OF A CHILD.

POINT II

THE TRIAL COURT GAVE INCOMPLETE AND ERRONEOUS JURY CHARGES WITH REGARD TO HOW THE JURY SHOULD DETERMINE WHETHER MR. MCINERNEY HAD EITHER A "LEGAL DUTY" OR HAD "ASSUMED RESPONSIBILITY" FOR THE ALLEGED VICTIMS, IN THAT THE TRIAL COURT GAVE AN INCOMPLETE, CONTRADICTORY, AND MISLEADING *STATE V. GALLOWAY* [133 *N.J.* 631, 628 *A*.2d 735 (1993)] CHARGE AND FAILED TO GIVE ANY CHARGE UNDER *STATE V. BUSC-HAM* [360 *N.J.Super.* 346, 823 *A*.2d 71 (App.Div.2003)]. THUS, THE CONVIC-TIONS SHOULD BE REVERSED. (PARTLY RAISED BELOW).

POINT III

THE TRIAL COURT'S INCOMPLETE/ERRONEOUS JURY INSTRUCTIONS WERE COMPOUNDED BY AN ERRONEOUS, MISLEADING, AND GRAM-MATICALLY INCOMPREHENSIBLE VERDICT SHEET THAT FAILED TO DIFFERENTIATE BETWEEN THE TWO DIFFERENT FORMS OF THE OFFENSE DEFINED BY THE STATUTE. THE JURY WAS NOT TOLD THAT IT MUST BE UNANIMOUS AS TO ONE FORM OF THE CRIME OR THE OTHER TO RETURN A GUILTY VERDICT AND THE JURY COULD NOT RETURN A GUILTY VERDICT IF JURORS WERE SPLIT AS TO WHICH FORM APPLIED. THE VERDICT SHEET ALSO INCORRECTLY TOLD THE JURY THAT DEFENDANT COULD BE FOUND GUILTY IF THE ALLEGED CONDUCT "COULD" (AS OPPOSED TO "WOULD") MAKE THE ALLEGED VICTIM AN ABUSED OR NEGLECTED CHILD. THERE-FORE, THE CONVICTIONS MUST BE REVERSED. (PLAIN ERROR).

POINT IV

THE STATUTE FOR ENDANGERING THE WELFARE OF A CHILD, AS WRITTEN AND AS APPLIED, IS UNCONSTITUTIONALLY VAGUE IN THAT IT DOES NOT CLEARLY DEFINE (1) "SEXUAL CONDUCT"; (2) THE AGE AT WHICH A PERSON IS CONSIDERED A "CHILD"; (3) WHAT CONSTITUTES AN "ABUSED OR NEGLECTED" CHILD; AND (4) WHAT

DEFINES THE "LEGAL DUTY" FOR THE CARE OF A CHILD OR THE "ASSUMED RESPONSIBILITY" FOR THE CARE OF A CHILD.

POINT V

THE TRIAL COURT IMPROPERLY ADMITTED *N.J.R.E.* 404(b) EVIDENCE REGARDING THE TRIPS TO ALASKA AND HAWAII AS PROOF OF PRE–DISPOSITION TO COMMIT CRIMES, WHICH EVIDENCE SHOULD HAVE BEEN BARRED BY THAT EVIDENCE RULE AND BECAUSE THE PROSECUTION LACKED TERRITORIAL JURISDICTION. THE TRIAL COURT IMPROPERLY ADMITTED *N.J.R.E.* 404(b) EVIDENCE REGARDING CONVERSATIONS WITH ALLEGED VICTIMS OVER THE AGE OF EIGHTEEN AS WELL. THERE WAS NO *N.J.R.E.* 105 LIMITING INSTRUCTION AS TO THE EVIDENCE FROM ALASKA, HAWAII, AND THE EIGHTEEN YEAR OLD ALLEGED VICTIMS. THEREFORE, THE CONVICTION MUST BE REVERSED (PARTLY RAISED BELOW).

POINT VI

THERE WAS PROSECUTORIAL MISCONDUCT DURING THE CROSS–EXAMINATION OF DEFENDANT AND DURING THE STATE'S SUMMATION REQUIRING THE REVERSAL OF THE CONVICTION. (PARTLY RAISED BELOW).

POINT VII

THERE WAS JURY MISCONDUCT DURING THE TRIAL THAT THE TRIAL COURT DID NOT ADDRESS PROPERLY, WHICH CORRUPTED THE JURY'S DELIBERATIVE PROCESS AND REQUIRES REVERSAL OF THE CONVICTION.

POINT VIII

THERE WAS INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR DEFENDANT THAT LED TO THE CONVICTIONS AND REQUIRES REVERSAL OF SAME.

POINT IX

THE CUMULATIVE ERROR COMMITTED IN THIS CASE REQUIRES THE REVERSAL OF THE CONVICTIONS AND SENTENCE.

POINT X

THE SENTENCE OF THREE CONSECUTIVE SIX–YEAR PRISON TERMS, TOTALLING EIGHTEEN YEARS OF INCARCERATION FOR THIS DEFENDANT, WHO HAS AN UNBLEMISHED PAST RECORD AND WAS AN OTHERWISE EXEMPLARY CITIZEN, WAS EXCESSIVE AND THE MATTER SHOULD BE REMANDED FOR RE–SENTENCING.

II

A

Subsection a of *N.J.S.A.* 2C:24–4 defines second- and third-degree crimes of endangering the welfare of a child as follows:

a. *Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child* [and engages in the prohibited conduct or causes the harm specified] *is guilty of a crime of the second degree. Any other person* who engages in conduct or who causes harm as described in this subsection to a child under the age of 16 *is guilty of a crime of the third degree.*

[ (Emphasis added).]

Under this statute, only those having a "legal duty" or who have "assumed responsibility" for the care of the child-victim may be convicted of second-degree endangering. By providing enhanced punishment for those with "supervisory responsibility," the Legislature accounted for a unique "harm," "the profound effect on a child when the harm [of endangering] is inflicted by a parental figure in whom the child trusts." *State v. Galloway,* 133 *N.J.* 631, 660–61, 628 *A.*2d 735 (1993); *see also State v. Miller,* 108 *N.J.* 112, 120, 527 *A.*2d 1362 (1987). The Legislature's focus on this harm is evidenced not only by the enhanced punishment but also by the fact that only those who have a legal duty or have assumed responsibility for care of the child may be convicted of endangering the welfare of a child sixteen years of age or older under *N.J.S.A.* 2C:24–4a. *Cf. N.J.S.A.* 9:6–3 (defining a fourth-degree crime that applies to "any person" who abuses a child under the age of eighteen); *In re R.B.,* 376 *N.J.Super.* 451, 467, 870 *A.*2d 732 (App.Div.) (noting its applicability to children under the age of eighteen), *certif. denied,* 185 *N.J.* 29, 878 *A.*2d 848 (2005); *State v. D.V.,* 348 *N.J.Super.* 107, 113–116, 791 *A.*2d 304 (App.Div.2002) (discussing prosecutorial discretion to charge under *N.J.S.A.* 2C:24–4a or *N.J.S.A.* 9:6–3).

Defendant contends that the State's evidence of his "legal duty for the care of" or assumption of "responsibility for the care of" each victim was inadequate to establish his guilt and that the jury was given a confusing and inadequate instruction on this element of the crime. Either deficiency would require reversal of these convictions. *See State v. Denofa,* 187 *N.J.* 24, 40–41, 898 *A.*2d 523 (2006) (discussing the State's obligation to prove material elements

of the crime);[2] *Galloway, supra,* 133 *N.J.* at 662, 628 *A.*2d 735 (reversing on finding the jury instruction "plainly erroneous" and the evidence "not sufficient").

Both of defendant's claims require consideration of the meaning of the phrase "assumed responsibility for the care of the child." In 1992, the Court interpreted that clause of *N.J.S.A.* 2C:24–4a in *Galloway.*[3] 133 *N.J.* at 658–62, 628 *A.*2d 735. Although the Legislature has amended *N.J.S.A.* 2C:24–4 on numerous occasions since *Galloway,* it has not altered the language the Court construed. *See L.* 2001, *c.* 291, § 1; *L.* 1998, *c.* 126, § 1; *L.* 1995, *c.* 109, § 1. That is persuasive evidence of the Legislature's agreement with the Court's interpretation. *Quaremba v. Allan,* 67 *N.J.* 1, 14–15, 334 *A.*2d 321 (1975).

The Court, concluding that the phrase "has assumed responsibility" could be understood to encompass either temporary or only "more permanent" arrangements, construed the ambiguity against the State. *Galloway, supra,* 133 *N.J.* at 658, 628 *A.*2d 735. Reviewing the legislative history and other statutes addressing abuse and neglect, the Court determined that the phrase captures only "those who have assumed a general and ongoing responsibility for the care of the child." *Id.* at 661, 628 *A.*2d 735. Elaborating, the Court explained that the responsibility "may be legal and formal or it may arise from informal arrangements." *Ibid.* It could be based not only on a parental relationship or legal custody

---

[2] Responsibility for the care of the child is a material element of the second-degree crime. *See N.J.S.A.* 2C:1–14h(2)(a) (defining "element of an offense" to include "attendant circumstances" "included in the description of the forbidden conduct in the definition of the offense"); *N.J.S.A.* 2C:1–14i (defining "material element of an offense" to exclude matters that are "unconnected with" the "harm or evil, incident to [the] conduct").

[3] After the crime in *Galloway* was committed, the Legislature elevated these crimes from the third and fourth degree to the second and third degree. *L.* 1992, *c.* 6, § 1. Thus, where the Court refers to the third-degree crime, it is discussing the more serious of these offenses, which is now a crime of the second degree.

but also on "less structured relations," such as cohabitation with a parent of the child. *Ibid.*

Most pertinent here, the Court held that the defendant "must have established a *continuing or regular* supervisory *or* caretaker relationship with the child that would justify the harsher penalties of the [second-degree] crime." *Ibid.* (emphasis added). The Court contrasted that type of relationship with that of "a person assuming only temporary, brief, or occasional caretaking functions, such as irregular or infrequent babysitting, [who] would be chargeable with child endangerment in the [third] degree." *Id.* at 661–62, 628 *A*.2d 735.

The justification for harsher penalties for those who have assumed responsibility for the care of a child is noted above—"the particular emotional harm" and its "profound effect on the child when the harm is inflicted by a parental figure in whom the child trusts." *Id.* at 661, 628 *A*.2d 735. As the Court explained, the "nature and extent of supervisory responsibility" is a factor important to the "harm inflicted on children." *Id.* at 660, 628 *A*.2d 735.

B

The evidence and available inferences, viewed in the light most favorable to the State, were adequate to prove beyond a reasonable doubt that defendant had "assumed responsibility for the care of" these children when he engaged in conduct endangering their welfare. See *State v. Reyes,* 50 *N.J.* 454, 458–59, 236 *A*.2d 385 (1967). A jury could find that defendant supervised these children, who trusted and admired him, on a regular and continuing basis, over extended periods of time and in matters generally committed to a child's parents. True, defendant did not live with the children and have the caretaking role that comes with cohabitation. But he extended his "supervisory" authority into their respective homes by: directing them to report their intimate behavior in a manner that only he and they would understand; supplying them with condoms for use as he directed; rewarding compliance with his directions on sexual matters; and speaking to

them when they did not report with the regularity or frequency he directed. Additionally, he counseled them about alcohol and drug use, and he invited them to call him, in lieu of their parents, for a ride if they drank too much. Also, he intervened on behalf of a student who sought his help when his behavior came to the attention of the police.

In short, defendant assumed the role of a regular and primary supervisor in matters particularly suitable for parental oversight and wholly unrelated to performance and behavior on the playing field. The depth of the relationships he established with the children is demonstrated by the fact that several kept in touch with him after reaching the age of majority and graduating from the high school.

## C

■ The difficulty with defendant's conviction lies with the guidance the jurors were given on determining whether he assumed responsibility for the several children.[4] The judge gave the following instruction on this element:

> The fourth element the State must prove beyond a reasonable doubt is that the defendant had a legal duty for the care of the child or assumed responsibility for the care of the child. A person having legal duty for the care of a child or who has assumed responsibility for the care of a child includes the following: A natural parent, an adoptive parent, a foster parent, a step-parent, or any other person who has assumed responsibility for the care, custody or control of a child or upon whom there's a legal duty for such care. A person who has assumed the responsibility for the care of a child includes any person who assumes a general ongoing responsibility for the child and who establishes a continuing or regular supervisory or caretaker relationship with the child. . . .

> As previously noted, under appropriate circumstances, a person who has assumed responsibility for the care of a child may include a teacher, employee, volunteer, whether compensated or uncompensated, of an institution who is responsible for the child's welfare, and a person who legally or voluntarily assumes the care, custody, maintenance, or support of the child. It can also include any staff

---

[4] The judge gave the jurors no direction on how to determine whether defendant had a legal duty for the care of the children, and the State presented no evidence on that point. Accordingly, his convictions cannot be confirmed on that basis.

person of an institution regardless of whether or not the person is responsible for the care or supervision of the child, as well as teaching staff members or other employees, whether compensated or uncompensated of a day school. However, it includes only those who assume a general and ongoing responsibility for the child and who ha[ve] established a continuing and [a] regular supervision or caretaking relationship with the child. It does not include one who only assumes a temporary, brief, or occasional caretaking function.

This instruction clearly provided the jurors with adequate direction on *Galloway's* critical distinction between persons who assume "general and ongoing responsibility" for "regular supervision *or* caretaking" and those who assume "a temporary, brief, or occasional caretaking function." The difficulty is that the judge also directed the jurors that "under appropriate circumstances," a person who has assumed responsibility for the care of a child may include a staff member of a school. The judge did not, however, explain what "the appropriate circumstances" were and effectively left the legal standard to the judgment of the jurors.

Although one might conclude that the jurors, considering the instruction as a whole, would understand that defendant, a school employee, could not be found guilty unless he had assumed an ongoing responsibility for the child and established a continuing and regular supervision or caretaking relationship with each child, other portions of the instruction defeat that assumption.

The judge gave the jury another instruction that referred to persons denoted by position as "custodians" in *N.J.S.A.* 9:6-2 and to persons denoted as "parents or guardians" in *N.J.S.A.* 9:6-8.21, which was inconsistent with and not limited by reference to the *Galloway* standard. In defining the harm that would make a child abused or neglected, the judge explained:

The definition of an abused or neglected child includes a person whose parent or guardian commits or allows to be committed an act of sexual abuse against the child. *Parent or guardian means any person who has assumed responsibility for the care, custody, or control of the child upon whom there is a legal duty for such care.*

Parent or guardian includes teacher, employee, or volunteer, whether compensated or uncompensated of an institution who is responsible for the child's welfare and any other staff person of an institution regardless of *whether or not the person is responsible for the care or supervision of the child. . . . .*

In this context, the definition of parent or guardian also includes teaching staff member or other employee, whether compensated or uncompensated, of a day school as defined in Title 9. Day school means a public or private school which provides general or special educational services to day students in grades kindergarten through 12.

[ (Emphasis added).]

With the foregoing instruction, the judge effectively directed the jurors that a school employee, even one without any responsibility for the care of the child, was included in the definition of parent or guardian along with those who have assumed responsibility for the care of a child. The instruction is easily understood as equating school employees with no responsibility for a child with persons who have assumed responsibility for a child. That proposition is clearly inconsistent with *Galloway*. An incorrect charge on an essential element of a crime is reversible error, *State v. Koskovich*, 168 *N.J.* 448, 508, 776 *A.*2d 144 (2001), and where inconsistent charges, one right and one wrong, are given a reviewing court cannot determine which one the jury followed. *State v. Moore*, 122 *N.J.* 420, 432–33, 585 *A.*2d 864 (1991). That is the case here.

We would be remiss if we did not identify the likely source of this error. In incorporating this list of actors who may be among those who have assumed responsibility for the care of a child, the judge followed footnote 5 of the Model Charge, which recites a list of persons denoted by position, including employees of institutions with no supervisory responsibility, that is taken from *N.J.S.A.* 9:6–2 and *N.J.S.A.* 9:6–8.21. That portion of the Model Charge is inconsistent with the plain language of *N.J.S.A.* 2C:24–4a, *Galloway* and this court's decision in *State v. Demarest*, 252 *N.J.Super.* 323, 329, 599 *A.*2d 937 (App.Div.1991).

In pertinent part, *N.J.S.A.* 2C:24–4a provides:

a. Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child, *or who causes the child harm that would make the child an abused or neglected child as defined in R.S.9:6–1, R.S.9:6–3 and P.L.1974, c. 119, s.1 (C.9:6–8.21)* is guilty of a crime of the second degree....

[ (Emphasis added).]

In construing a statute, courts look to its language and follow it without further inquiry when it is clear. *State v. Regis,* 208 *N.J.* 439, 447, 32 *A.*3d 1109 (2011). As we explained in *Demarest,* "[a]lthough *N.J.S.A.* 2C:24–4a incorporates the provisions of Title 9 to describe the kind of 'harm' to a child required to establish the offense, it does not refer to Title 9 to define the other elements of the offense . . . ." 252 *N.J.Super.* at 329, 599 *A.*2d 937; *see also Galloway, supra,* 133 *N.J.* at 659, 628 *A.*2d 735 (noting that *N.J.S.A.* 2C:24–4a "specifies the harm" that "constitute[s] the abuse or neglect of a child" by specific reference to *N.J.S.A.* 9:6–1, –3 and –8.21). The language of *N.J.S.A.* 2C:24–4a plainly does not incorporate the provisions of Title 9 except with respect to the "harm that would make a child abused or neglected."

It is also apparent that any reliance on the list of actors found in *N.J.S.A.* 9:6–8.21 or *N.J.S.A.* 9:6–2 would be inconsistent with *Galloway.* In interpreting the phrase "assumed responsibility for the care of a child," which the *Galloway* Court found ambiguous, the Court considered *N.J.S.A.* 9:6–2 and 9:6–8.21. 133 *N.J.* at 659, 628 *A.*2d 735. Five years before *Galloway* was decided, the Legislature added the list of persons denoted by position that is found in footnote 5 of the Model Charge and *N.J.S.A.* 9:6–2 and *N.J.S.A.* 9:6–8.21. *L.* 1987, c. 341, §§ 2, 6. Thus, the fact that the Court did not mention the list of persons denoted by position indicates that the Court did not deem the listing pertinent or helpful to the interpretation or future application of this element of second-degree endangering. As Judge Skillman noted in *Demarest,* there are significant "differences in the legislative objectives of *N.J.S.A.* 2C:24–4a and *N.J.S.A.* 9:6–8.21 to –8.73" that militate against broader incorporation of Title 9 in *N.J.S.A.* 2C:24–4a. 252 *N.J.Super.* at 330, 599 *A.*2d 937. Judge Skillman observed that "the essential objective of *N.J.S.A.* 2C:24–4a is to deter conduct that unjustifiably inflicts or threatens serious harm to others, to rehabilitate offenders and to confine persons when required for public protection." *Ibid.* (citations omitted). But, "the focus of proceedings under Title 9 is not the culpability of parents' conduct but rather the protection of children from acts or

conditions which threaten their welfare." [5]   *Ibid.* (citations omitted).

In a case involving prosecution of a mother for "a long course of sadistic, violent abuse, both physical and mental" of a child in her custody, we rejected defendant's objection to the adequacy of a jury charge on the harm that makes a child abused. *State v. T.C.,* 347 *N.J.Super.* 219, 223, 789 *A.2d* 173 (App.Div.2002), *certif. denied,* 177 *N.J.* 222, 827 *A.2d* 289 (2003). The instruction, in part pertinent here, stated: "Abused or neglected child means a child less than eighteen years of age *whose parent or guardian, as herein above defined,* inflicts upon such child physical injury, by other than accidental means, which causes or creates a substantial risk of protracted impairment of physical or emotional health." *Id.* at 239–40, 789 *A.2d* 173. (emphasis added).

In *T.C.,* where there was no issue as to legal duty and no claim that the instruction "misstated the law," we approved of the trial court's "quoting and paraphrasing" provisions of Title 9 in describing the harm that makes a child abused or neglected and rejected defendant's claim that "a specifically tailored instruction relating the facts of the case to the applicable law" was required. *Id.* at 240, 789 *A.2d* 173. *T.C.* does not endorse a jury instruction that would suggest a person who had no responsibility or legal duty for

---

[5] Another factor militates against reliance on the definitions found in *N.J.S.A.* 9:6–8.21 as amended by *L.* 1987, *c.* 341. Neither the phrase defining the relationship between adult and child warranting additional punishment nor the phrase that defines the harm of abuse and neglect by reference to *N.J.S.A.* 9:6–1, –6.3 and –8.21 has been amended since 1979. *Compare N.J.S.A.* 2C:24–4a *with L.* 1979, *c.* 178, § 46. Indeed, *N.J.S.A.* 2C:24–4a still refers to *N.J.S.A.* 9:6–8.21 as adopted in *L.* 1974, *c.* 119. Moreover, the drafters of *N.J.S.A.* 2C:24–4a expressly stated an intention to adopt "existing law." 2 *Final Report of the New Jersey Criminal Law Revision,* commentary § 2C:24–4 at 260 (1971); *see generally In the Matter of the Commitment of E. S.,* 118 *N.J.* 118, 133–36, 570 *A.2d* 917 (1990) (discussing the general rules of statutory interpretation that govern when a statute incorporates another by reference and the incorporated statute is amended and concluding that the question is ultimately one of legislative intent). See also *In the Matter of the Commitment of E. S., supra,* 118 *N.J.* at 132 n. 6, 570 *A.2d* 917, for a discussion of the State constitutional issue raised limiting incorporation by reference.

the care of a child may be convicted of second-degree endangering because the person holds a position that is among those included in the broad definition of parent or guardian currently set forth in *N.J.S.A.* 9:6–8.21.

We urge the Supreme Court's Committee on Model Criminal Jury Charges to reconsider the guidance provided in footnote 5 of the Model Charge. As it stands, this footnote has the potential to invite instructions that are confusing to the jury and have the capacity to distract them from the central inquiry as defined in *Galloway.* We suggest the Committee also consider adding a footnote cautioning against incorporation of Title 9's definitions of parent or guardian or custodian in explaining the harm that makes a child abused or neglected.

Where the evidence of ongoing and continuous responsibility is supervisory in nature, rather than custodial, additional guidance may be drawn from *State v. Buscham,* 360 *N.J.Super.* 346, 360, 823 *A.*2d 71 (App.Div.2003), a case enumerating factors pertinent to the question of whether a gymnastics instructor had the "supervisory or disciplinary power" over a student essential to his conviction for sexual assault as defined in *N.J.S.A.* 2C:14–2a(2)(b). The considerations under *N.J.S.A.* 2C:24–4a focus more on the dependence and trust the child places in the adult than on the coercive aspects of the relationship defined as "supervisory or disciplinary power" in *N.J.S.A.* 2C:14–2a(2)(b). Nevertheless, there is some overlap. Thus, factors such as disparity in ages or maturity; the importance of the activity the adult supervises to the child; and the extension of the supervisory relationship beyond "guidance and advice" expected given the defendant's supervisory role, all are relevant to an assessment of whether defendant assumed ongoing and continuing responsibility for the care of the child through a "continuing or regular supervisory" relationship. *See Galloway, supra,* 133 *N.J.* at 661, 628 *A.*2d 735. The jurors did not have that guidance here.

The "clear and correct jury instructions [that] are essential to a fair trial" were not given here. *State v. N.I.,* 349 *N.J.Super.* 299,

308, 793 *A*.2d 760 (App.Div.2002). Accordingly, we remand for a new trial.

## III

Our determination that error in the jury instruction requires reversal makes it unnecessary to address defendant's claims of trial and sentencing error raised in Points III, V, VI, VIII, IX and X. We add the following with respect to defendant's objection to the admission of evidence of acts and conversations that took place outside New Jersey and with a child over the age of eighteen at the time. In admitting that evidence, the trial judge relied on the common law doctrine of res gestae. Subsequent to this trial, the Supreme Court disapproved reliance on that doctrine and set forth a new framework for admission of evidence about conduct not charged in the indictment. *State v. Rose*, 206 *N.J.* 141, 179–84, 19 *A*.3d 985 (2011). Rather than address the application of *Rose* to these facts in the first instance, we direct the trial court to reconsider the admissibility of this evidence in light of *Rose*.

## IV

The only other point upon which we comment is defendant's contention that the endangering statute, "as written and as applied, is unconstitutionally vague ...." This claim lacks sufficient merit to warrant discussion beyond the brief comments that follow. *R.* 2:11–3(e)(2).

▪ A general claim that a statute is vague as written, a facial challenge, may be voided if it is " 'impermissibly vague in all its application[s],' that is, there is no conduct that it proscribes with sufficient certainty." *State v. Cameron*, 100 *N.J.* 586, 593, 498 *A*.2d 1217 (1985) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 495, 102 *S.Ct.* 1186, 1191, 71 *L.Ed.*2d 362, 369 (1982)). We rejected a facial challenge to *N.J.S.A.* 2C:24–4a in *State v. M.L.*, 253 *N.J.Super.* 13, 30, 600 *A*.2d

1211 (App.Div.1991), and see no basis for reaching a different conclusion at this juncture.

"A statute that is challenged as applied ... must be shown to be unclear in the context of the particular case." *Cameron, supra,* 100 *N.J.* at 594, 498 *A.*2d 1217. Here there is no question that defendant's encouragement of boys to accept payment for reporting on sexual behavior directed by him was conduct clearly falling within the statute as conduct that would debauch their morals. Additionally, his assumption of ongoing and continuing supervision of their sexual acts in this manner clearly brings him within the class of persons eligible for conviction of second-degree endangering.

Reversed and remanded for a new trial.