# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0101-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ELIAS CANO,

    Defendant-Appellant.

_____

Argued October 23, 2023 – Decided March 1, 2024

Before Judges Gilson, DeAlmeida, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-11-0885.

Austin J. Howard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Taylor Louise Napolitano, Assistant Deputy Public Defender, of counsel and on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the brief).

PER CURIAM

Defendant, Elias Cano, appeals from a jury verdict finding him guilty of sexually assaulting A.V., a nine-year-old girl.[1] A.V. described the assault to a forensic interviewer at the Passaic County Prosecutor's Office and her statement was video recorded. That video was admitted into evidence at trial and viewed by the jury three separate times during deliberations. Defendant contends the trial court failed to follow procedural safeguards outlined by our Supreme Court regarding the playback of video-recorded statements during jury deliberations. Defendant further argues the trial court should have declared a mistrial after the jury requested to view the video a third time and should have dismissed one of the charges against him in light of the evidence adduced at trial. Finally, defendant challenges his sentence, contending the mandatory twenty-five-year parole bar imposed on him is unconstitutional. Having considered these arguments in the full context of the trial record, we discern no reversible error and affirm.

I.

1.    The allegations, investigation, and trial.

_____

[1] Initials for the child sexual assault victim and her family are used to protect their privacy interests. R. 1:38-3(c)(9), (12).

A-0101-20

We glean the following facts from the record. In 2018, defendant and his partner, L.M., resided in Paterson, New Jersey with their five-year-old son E. and infant daughter A. L.M.'s sister, J.E., also lived with them. A.G. and her three daughters, including nine-year-old A.V., lived next door.

Around May 2018, A.G. asked L.M. if she would babysit two of her daughters, including A.V., on weekends from approximately 8:00 a.m. to 6:00 p.m. L.M. began babysitting the children in her home in May 2018. As defendant worked in construction in Connecticut, Monday through Saturday from 6:00 a.m. to 6:00 p.m., he was not present when L.M. babysat the children on Saturdays. Defendant did not work on Sundays and was present when L.M. babysat the children on those days. He also accompanied L.M. and all the children, including some of A.G.'s children, to church on Sundays and other outings.

On August 6, 2018, A.V. told her mother "the same thing that happened to me with Jose happened but differently." A.V. was referring to an incident in 2016, when a family friend named Jose sexually assaulted her. A.V. explained to her mother defendant had pulled down her pants and panties and kissed her mouth and "private parts." A.G. reported the incident to the police, and she and A.V. met with a detective in the Passaic County Prosecutor's Office on August

3

9, 2018. On that same day, A.V. was interviewed by Giselle Henriquez, a child forensic interview specialist with the prosecutor's office who had previously interviewed A.V. in connection with the investigation into the assault committed by Jose. The interview was video recorded.

In the interview, A.V. explained the same thing had happened to her but now with someone different. She explained that one day, when L.M. was babysitting, L.M. and defendant had stepped out to go to a laundromat, leaving A.V. at home with one of her sisters, J.E., and five-year-old E. Defendant returned home without L.M. and locked himself and A.V. inside a bedroom. Defendant then removed her pants and underwear and kissed her on the mouth and her "private part." When shown a diagram of a female body by Henriquez, A.V. identified the vagina as the "private part" she was referring to, and added defendant licked the inside and outside of her private part. A.V. also stated defendant kissed her buttocks and his hands moved in a "wobble" inside and outside of her private part and buttocks. She further stated defendant pushed up her shirt and bra and kissed and licked her "boobs." A.V. also mentioned she considered telling her friend Mariah about what had happened but had not.

During the interview, Henriquez asked A.V. to speak only of the incident concerning defendant. A.V. explained Jose had never pulled her pants down but

4

defendant did, and Jose had pulled his own pants down, but defendant had not done that.

Approximately three months later, a grand jury returned an indictment, charging defendant with three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and one count of endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).

A jury trial was conducted over three days in October 2019. The jury heard testimony from seven witness: A.G., A.V., a detective with the Passaic County Prosecutor's Office, Henriquez, L.M., J.E., and defendant. The jury also viewed A.V.'s video-recorded interview with Henriquez, which was admitted into evidence by the State without objection from defendant.[2]

A.G. testified about the disclosure A.V. made to her in August 2018, and explained A.V. told her defendant pulled down her pants and panties and kissed her on her mouth and private part. She also testified that L.M. was A.V.'s babysitter, not defendant.

---

[2]  A transcript of the interview was also admitted into evidence without objection.

A-0101-20

A.V., who was ten by the time of trial, testified about the alleged assault. She explained that on one of the weekends she was being cared for at L.M. and defendant's home, she went into a bedroom to retrieve her stuffed animal. Defendant then walked in behind her, locked the door, and used his "[h]and and mouth" to "touch[] [her]" "in [her] private on [her] body." She testified after defendant had touched her, he told her not to tell anyone.

During her testimony, A.V. was also shown two diagrams of the female body. On one of them she circled her vagina, where she testified defendant touched her with his mouth, and on the other she circled her vagina and buttocks, where she testified defendant touched her with his hand. On cross-examination, A.V. testified her sister and defendant's son were knocking on the door during the assault. She also testified she disclosed the assault to her friend Mariah.

Henriquez and the detective testified about their roles in the investigation and the interviews they conducted. The detective explained that the prosecutor's office had received a referral from the Department of Child Protection and Permanency regarding an alleged case of sexual assault involving a nine-year-old female victim. He interviewed A.G. and observed Henriquez's interview of A.V.

6

Henriquez testified about her experience and her interview of A.V. The video-recorded interview of A.V. was played for the jury during Henriquez's testimony.

Defendant, who was twenty-three-years-old at the time of trial, testified on his own behalf. He denied abusing A.V., touching her inappropriately, or being alone with her. Defendant, L.M., and J.E. all testified the entire family, as well as A.V. and her sister, attended church on the morning of the alleged assault and after church, A.V. and her sister played in a park. L.M. and J.E. both testified A.V. and her sister ran through sprinklers at the park and got wet. L.M. wanted to dry their clothes before they were picked up by their mother, so the children changed, and she took the children's clothes to the laundromat. Defendant, L.M., and J.E. testified defendant went with L.M. to the laundromat and did not return home alone. J.E. stated A.G. arrived to pick up A.V. and her sister before L.M. and defendant had returned home.

During summations, defense counsel argued the State had presented only the uncorroborated testimony of A.V. Counsel further argued A.V. had been inconsistent in her account of what happened, specifically pointing out inconsistencies between A.V.'s trial testimony and the video-recorded interview. Counsel noted, although A.V. testified her sister and defendant's son were

7

knocking on the door at the time of the assault, she did not mention that in the video-recorded interview. Further, counsel noted A.V. testified she had told her friend Mariah about the assault but said the opposite in the video interview. Defense counsel encouraged the jurors to: "Look at the video. Look how many times it took Giselle Henriquez to get [A.V.] to acknowledge that she had to tell the truth. [A.V.] was having a very hard time because she knew that she was lying. [A.V.] knew that didn't happen to her."

In response, the State argued A.V. had been largely consistent between her testimony and the video-recorded interview, noting she consistently identified defendant, said he had locked the door, and said he had touched her with his hands and mouth. The State did acknowledge there was "a little more on . . . [the recorded] interview and a little less in court." The State argued to the jurors they could "assess that through the lens of [A.V.'s] affect and demeanor and understand why there's a little bit more in the video and a little bit less in the courtroom."

2. Deliberations and sentence.

Following summations, the jury deliberated for six days before rendering a verdict. On the first day of deliberations, the court received a note from the jurors with three questions. First, the jurors asked whether they could "see the

8

forensic interview again." On this question, the court decided, without objection from defense counsel, it would have the video played back to the jury in the courtroom. Second, the jurors asked "[h]ow much time passed between when [A.G.] reported the incident to police and when the forensic interview happened." Finally, the jurors asked "[h]ow much time passed between when . . . the incident with Jose happened and when it was reported to the police." The court informed the jurors these were issues of fact for them to decide. The court then replayed the video-recorded interview of A.V. in the courtroom for the jury and instructed the jurors they were to "consider all of the evidence presented and not give undue weight to the video that was played back."

On the second day of deliberations, the court received another note from the jurors, stating they wanted to "hear the testimony and/or receive the transcripts [from] the following witnesses again[:] [A.G.], [A.V.] courtroom testimony only, [defendant], [J.E.], and [L.M.]." Because only audio recordings were available of the courtroom testimonies, the court explained to the jurors that it would have the audio played back to them, again in the courtroom.

On the third day of deliberations, the jury heard the played back testimonies of A.G., A.V., defendant, J.E., and L.M. The trial court then instructed the jurors they were to consider all the evidence presented and not

give undue weight to the testimonies that had been replayed. The jurors continued deliberating and, on that same day, sent a note to the court stating: "After three days of reviewing all the evidence, we are hopelessly deadlocked. We do not see a unanimous decision coming with any further deliberation. What should we do?"

In response, defense counsel and the State agreed the court should give the jurors the model jury instruction regarding further deliberations. Accordingly, the court gave the jurors the following instruction:

> [I]t is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In your course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges of the facts.
>
> With that folks, I'm going to tell you to go back and continue with your deliberation. And I'm going to give you your question back.

On the fourth day of deliberations, the court received another note from the jury stating they wanted to "see [A.V.]'s forensic interview again, starting

after the family and neighbors are introduced, before she starts describing the incident through to the end of the interview." The note further stated they wanted to "hear [A.G.'s] courtroom testimony in full again." Defense counsel did not object to the jury's request to hear the video-recorded interview again. Instead, defense counsel suggested the entire video be played, rather than only the portion the jury requested. The court rejected that suggestion and decided only the portions of the video the jury requested should be played back to them. That portion, as well as the audio of A.G.'s testimony, was then replayed for the jurors in the courtroom. The court then instructed the jurors "to consider all of the evidence and not give undue weight to the testimony [they had] heard, seen played back."

On the fifth day of deliberations, the court received another note from the jurors asking to "listen to the video and courtroom testimony where [A.V.] talks about cunnilingus only this/those sections." Although defense counsel did not object to this request, he told the court he thought the jury was deadlocked. The State disagreed with defense counsel's suggestion, contending it appeared the jurors were having "meaningful discussions and deliberat[ions] and . . . serious questions and concerns about reviewing the playback."

A-0101-20

The court stated it was not prepared to declare the jury was hung, and, on the following day of deliberations, the court denied defense counsel's request, specifically noting how focused and conscientious the jury had been during its deliberations.

The court then had the portion of A.V.'s courtroom testimony and video-recorded interview played back for the jurors in the courtroom. Following the play back, the court instructed the jurors they were to "consider all of the evidence that was presented during the trial, and not give undue weight to the testimony and video statement that was played back." The jurors then continued deliberating and, on that same day, reached a unanimous verdict.

The jury found defendant guilty of one count of first-degree aggravated sexual assault, two counts of sexual assault, and one count of endangering the welfare of a child. The jury acquitted defendant of the remaining counts. On the State's motion, the trial court dismissed the jury's verdict regarding count four, one of the sexual assault counts, which charged defendant with having performed oral sex on A.V., because it was duplicative of count one, the aggravated sexual assault conviction.

Thereafter, the trial court sentenced defendant to an aggregate prison term of twenty-five years without the possibility of parole, parole supervision for life,

12

and registration under Megan's Law, N.J.S.A. 2C:7-1 to -23.[3] Relevant to this appeal, the court sentenced defendant to twenty-five years in prison for the aggravated sexual assault conviction and noted, pursuant to the "Jessica Lunsford Act,"[4] defendant had to "serve . . . [twenty-five] years before becoming eligible for parole." The sentences for the sexual assault and endangering the welfare of a child convictions were ordered to run concurrently with the sentence for aggravated sexual assault. This appeal followed.

## II.

Defendant makes three arguments on appeal, claiming the trial court erred 1) by replaying the video three times for the "hopelessly deadlocked" jury without following the procedural safeguards set forth in State v. Burr, 195 N.J. 119 (2018), and failing to declare a mistrial when the jury requested the video a third time; 2) by failing to dismiss the second-degree endangering count because he was not A.V.'s babysitter and owed her no duty of care; and 3) by imposing the mandatory twenty-five-year parole bar set forth in N.J.S.A. 2C:14-2a(1),

---

[3] The trial court later amended defendant's sentence to include, pursuant to the No Early Release Act, 2C:43-7.2, five years of post-release supervision for the aggravated sexual assault conviction.

[4] N.J.S.A. 2C:14-2.

which is unconstitutional as applied to him because of his youth and developmental delays. Defendant articulates these arguments as follows:

> POINT I – THE TRIAL COURT ERRED BY (A) REPLAYING A.V.'S VIDEO STATEMENT THREE TIMES FOR THE "HOPELESSLY DEADLOCKED" JURY WITHOUT FOLLOWING ANY OF THE PROCEDURAL SAFEGUARDS ENUNCIATED IN STATE V. BURR, 195 N.J. 119 (2008) AND (B) FAILING TO DECLARE A MISTRIAL AFTER THE THIRD REPLAY REQUEST.
>
> A. Replaying A.V.'s Video-Recorded Statement Three Times was Plain Error.
>
> B. The Court Erred by Failing to Declare a Mistrial.
>
> POINT II – [DEFENDANT] IS ENTITLED TO DISMISSAL OF THE SECOND-DEGREE ENDANGERING COUNT BECAUSE HE HAD NO DUTY OF CARE TO A.V. AND THE STATE CANNOT PROVE THAT ELEMENT AS A MATTER OF LAW.
>
> POINT III – THE MANDATORY 25-YEAR PAROLE BAR UNDER N.J.S.A. 2C:14-2A(1) IS UNCONSTITUTIONAL AS APPLIED TO [DEFENDANT], AN EMERGING ADULT WITH DEVELOPMENTAL DELAYS.
>
> The trial court's decisions to allow the jury to view the video during its deliberations.

Defendant contends the trial court failed to follow the procedures outlined by our Supreme Court regarding the playback of video-recorded statements

14

during deliberations. However, he did not object to the court's decisions to replay the video-recorded interview upon the jury's requests. Accordingly, we review defendant's argument under the plain error rule. R. 2:10-2. "Plain error is error that 'is clearly capable of producing an unjust result.'" State v. Weston, 222 N.J. 277, 294 (2015) (internal quotations omitted). "The error must have been of sufficient magnitude to raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached." Ibid. (citation omitted). "It is defendant's burden to demonstrate that the trial court['s] procedures constituted plain error." Id. at 295.

"[T]he response to a jury's request for a readback of testimony or a replay of a video recording is vested in the discretion of the trial judge." State v. A.R., 213 N.J. 542, 555-56 (2013). "Generally, once an exhibit has been admitted into evidence, the jury may access it during deliberations, subject to the court's instructions on its proper use." Burr, 195 N.J. at 133-34.

To be sure, a videotaped pretrial statement is significantly different from other exhibits. Although it is evidence, it is also testimony. Our Supreme Court has recognized "playing back [a] recorded [statement] reveals more than a sterile read-back does. A video playback enables jurors not only to recall specific testimony but also to assess . . . credibility . . . ." State v. Miller, 205 N.J. 109,

121 (2011). Accordingly, the danger "is that the jury may unfairly emphasize . . . videotaped statements over other testimony presented at trial." Burr, 195 N.J. at 134. Because a video-recorded statement "is powerful evidence for the jury to see again if it is not placed into context," our Supreme Court has set forth precautionary procedures for a trial court to use when a jury requests to review such evidence during deliberations. Id. at 134-35.

First, the jury should be asked if a readback of the statement would suffice. Id. at 135. "If the jury persists in its request to view the videotape again, then the [trial] court must take into consideration fairness to the defendant." Ibid. Second, "[t]he court must determine whether the jury must also hear a readback of any direct and cross-examination testimony that the court concludes is necessary to provide the proper context for the video playback." Ibid. Third, the trial court should deny the playback request if defendant demonstrates "consequential prejudice . . . from the playback could not be ameliorated through other means." Ibid. Finally, the playback "must occur in open court, along with the readback of related testimony that the court . . . require[s]." Ibid.

Here, the jury requested playbacks of A.V.'s video-recorded interview, which had been admitted into evidence, three separate times. Defendant was provided the opportunity to object, but instead consented and, in one instance,

16

asked for an expansion of the playback. Although the video playbacks occurred in open court, the trial court did not first ask the jury whether it would be satisfied with a readback of A.V.'s interview and it did not decide, at least on the record, whether the jury should also hear a readback or playback of any direct and cross-examination testimony necessary to provide the proper context for the video playback. Notwithstanding these omissions, we conclude the playing of the video-recorded interview does not constitute plain error.

First, defendant did not object to the trial court's decision to have the video played to the jury. In fact, when the jurors asked to see a portion of the video on the fourth day of deliberations, defense counsel suggested the entire video be replayed for the jurors rather than only the portion they had requested. Second, defendant did not request A.V.'s courtroom testimony be played in addition to the video-recorded interview to put the interview in proper context. Nevertheless, the jurors requested and heard portions of A.V.'s courtroom testimony in conjunction with their third viewing of the video-recorded interview. Lastly, during summations, defense counsel specifically referenced inconsistencies between A.V.'s trial testimony and video-recorded interview and encouraged the jurors to look at the video, placing the differences between the video and courtroom testimony at issue. Thus, it is apparent defense counsel

17

used the play backs to emphasize the inconsistencies in A.V.'s interview and testimony. Defendant cannot, therefore, now claim the court was wrong in allowing the jury to compare A.V.'s trial testimony to her video-recorded interview when he specifically urged the jury to do so. See A.R., 213 N.J. at 563 (declining to find reversable error where the record demonstrated "that defense counsel utilized the video recording as part of her defense strategy by encouraging the jury to thoroughly consider the video recording in its deliberations"). Finally, each time the jurors viewed the video-recorded interview during deliberations, the trial court instructed them to "consider all of the evidence presented and not give undue weight to the video that was played back." The jury is presumed to have understood and followed those instructions. See State v. Gonzalez, 249 N.J. 612, 635 (2022). In light of these circumstances, any error by the trial court was not clearly capable of producing an unjust result.

Defendant's motion for a mistrial.

The decision to grant or deny a mistrial is within the discretion of the trial court. State v. Johnson, 436 N.J. Super. 406, 421-22 (App. Div. 2014) (quoting State v. Paige, 256 N.J. Super. 362, 381 (App. Div. 1992)). We "will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that

18

results in a manifest injustice." State v. Patterson, 435 N.J. Super. 498, 510 (App. Div. 2014) (quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

Whether to grant a mistrial after a jury declares it is unable to reach a unanimous verdict "turns on whether the duration of the deliberations[,] balanced against the length of the trial and the complexity of the proofs[,] shows the jury has made a good-faith effort to reach a sustainable verdict." State v. Gleaton, 446 N.J. Super. 478, 514 (App. Div. 2016). If, after evaluating those factors, the court "is not satisfied that all possibilities of reaching a verdict have been exhausted," it "may send a jury back for further deliberations." State v. Harris, 457 N.J. Super. 34, 50 (App. Div. 2018) (quoting State v. Carswell, 303 N.J. Super. 462, 478 (App. Div. 1997)). If, however, the jury reports a "definite deadlock after a reasonable period of deliberations," the court's instruction to the jury to continue deliberating constitutes an abuse of discretion. State v. Adim, 410 N.J. Super. 410, 423 (App. Div. 2009) (emphasis omitted) (quoting State v. Czachor, 82 N.J. 392, 407 (1980)).

Defendant argues the trial court abused its discretion when it declined to declare a mistrial after the jury's third request to view the video of A.V.'s interview and contends, under these circumstances, the court should have declared a mistrial. Defendant notes the jury had previously declared it was

deadlocked on the third day of deliberations, it had already viewed the interview twice during deliberations, and the issues in the trial were not complex. However, defendant agreed with the State that the trial court should read the model jury charges regarding continued deliberations after the jury declared it was deadlocked and does not contest the trial court's findings the jurors were "very focused" and "conscientious in their . . . deliberative process." We conclude, under these circumstances, the trial court did not abuse its discretion in deciding not to declare a mistrial. See State v. Ross, 218 N.J. 130, 138-39, 145 (2014) (finding no abuse of discretion where a trial judge instructed the jury to continue deliberating even though the jury had already deliberated for five days and indicated it was unable to reach a verdict on any count).

Second-degree endangering the welfare of a child.

Defendant further argues the court should have dismissed the charges of second-degree endangering the welfare of a child because there was insufficient evidence demonstrating defendant had a legal duty to care for A.V. Defendant testified he was never alone with A.V., and A.G. testified she picked up her children from either L.M. or J.E. We review for plain error pursuant to R. 2:10-2 as this issue was also not raised to the trial court.

N.J.S.A. 2C:24-4(a)(1) provides:

> Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree. Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.

"Under this statute, only those having a 'legal duty' or who have 'assumed responsibility' for the care of the child-victim may be convicted of second-degree endangering." State v. McInerney, 428 N.J. Super. 432, 441 (App. Div. 2012). Our Supreme Court has explained the assumption of responsibility covers more than just the parent-child relationship, it "can be formal or informal; it can be based on custody situations and less-structured relations." State v. Sumulikoski, 221 N.J. 93, 107-08 (2015). Nevertheless, a defendant "must have established a continuing or regular supervisory or caretaker relationship with the child." State v. Galloway, 133 N.J. 631, 661 (1993).

Defendant's reliance on Galloway is misplaced. In Galloway, the defendant was at his girlfriend's home when she left to run an errand, leaving her three-month-old infant with him. The infant started crying and the defendant picked up the baby and violently shook him. Id. at 637-38. The shaking caused injuries that ultimately resulted in the infant's death. Ibid. Defendant was charged with what is now second-degree endangering the welfare of a child. Id.

21

at 640.  Following his conviction, the defendant challenged a jury instruction stating the jury could have found him guilty if, based on all the circumstances, it found he had "assumed responsibility for the care of" the infant.  Id. at 658.

Our Supreme Court concluded "the Legislature intended the crime of [second]-degree child endangerment to apply to a person who has 'assumed the care of a child' or is 'living with the child' or has a 'general right to exercise continuing control and authority over' the child."  Id. at 659.  The Court explained the crime applies:

> to those who have assumed a general and ongoing responsibility for the care of the child.  That responsibility may be legal and formal or it may arise from informal arrangements.  It may be based on a parental relationship, legal custody, or on less-structured relations; or it may arise from cohabitation with the child's parent.  The actor, however, must have established a continuing or regular supervisory or caretaker relationship with the child . . . .  Conversely, a person assuming only temporary, brief, or occasional caretaking functions, such as irregular or infrequent babysitting, would be chargeable with child endangerment in the [lesser] degree.
>
> [Id. at 661-62.]

The Court then noted the record evidence was insufficient to justify the charge against the defendant and explained the defendant "did not live with or near" the infant or the infant's mother and had only dated the mother for three months.  Id.

22

at 662. There was no evidence the defendant "regularly, frequently, or continuously assumed the care of the child." Ibid.

Here, defendant has not demonstrated plain error. The record establishes L.M. and defendant lived together, and A.V. was cared for every weekend in their home for a regular period of time in 2018. Defendant concedes he was home on Sundays when A.V. was present, and he accompanied A.V. to church and other family outings on Sundays. Although defendant testified he was never alone with A.V., the jury rejected that testimony. Thus, the evidence and all reasonable inferences therefrom were sufficient to warrant submission of this charge to the jury because a reasonable jury could conclude defendant assumed some regular responsibility for the care of A.V. on Sundays while both he and L.M. were present in their home and he had a supervisory or caretaker relationship with A.V.

Defendant's sentence.

Lastly, defendant challenges the mandatory minimum twenty-five-year parole bar imposed on him pursuant to N.J.S.A. 2:14-2(a)(1). He argues the mandatory imposition of this parole disqualifier is unconstitutional, as applied to him, because it does not allow a trial court to consider his youth and level of intelligence. He contends he was an "emerging adult" at the time of the offense

and emerging adults "have the same features as juveniles that render them less culpable."  He also claims the parole bar was "beyond what is necessary to serve penological goals" and "disproportionate to the offense."  Finally, he argues the twenty-five-year parole bar constitutes cruel and unusual punishment.

The Eighth Amendment provides "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  That provision is applicable to the states through the Fourteenth Amendment.  Roper v. Simmons, 543 U.S. 551, 560 (2005).  "Courts generally 'interpret the Eighth Amendment according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design.'"  State v. Pimentel, 461 N.J. Super. 468, 481 (App. Div. 2019) (internal quotations omitted) (quoting State v. Zuber, 227 N.J. 422, 438 (2017)).  "The interpretive process 'often requires refer[ence] to the evolving standards of decency that mark the progress of a maturing society.'"  State v. Comer, 249 N.J. 359, 383 (2022) (alteration in original) (internal quotations omitted) (quoting Zuber, 227 N.J. at 438).

Our State Constitution also bars cruel and unusual punishment.  N.J. Const. art. I, ¶ 12.  "To determine whether a punishment is cruel and unusual, it is appropriate to conduct an independent analysis under the State Constitution."

Comer, 249 N.J. at 383.  Nevertheless, the "test under both [the State and Federal] Constitutions is 'generally the same.'"  Ibid. (quoting Zuber, 227 N.J. at 438).  That test requires courts to examine whether: (1) "the punishment for the crime conform[s] with contemporary standards of decency[;]" (2) the punishment is "grossly disproportionate" to the crime; and (3) "the punishment go[es] beyond what is necessary to accomplish any legitimate penological objective."  Ibid. (quoting Zuber, 227 N.J. at 438).  A punishment that fails any of these inquiries "is invalid."  Ibid. (quoting State v. Gerald, 113 N.J. 40, 78 (1988)).

Defendant claims adults in their early twenties share the same features as juveniles, rendering them less culpable, without citing to any state law.  He argues he should be afforded similar protections as established by the United States Supreme Court in Miller v. Alabama, 567 U.S. 460 (2012), and amplified by our Supreme Court in Zuber, emphasizing his status as an "emerging adult."

In Miller, the U.S. Supreme Court recognized that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."  567 U.S. at 465, 472.  The Court further noted that "the characteristics of youth, and the way they weaken rationales for punishment, can render a life-

25

without-parole sentence disproportionate." Id. at 473. Accordingly, the Court determined sentencing schemes that "mandate[] life in prison without the possibility of parole for juvenile offenders" should be prohibited. Id. at 479-80.

In Zuber, our Supreme Court expanded the protections for juveniles outlined in Miller, 277 N.J. at 430, 433, 438, concluding Miller's requirement "that a sentencing judge 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison' applies with equal strength to a sentence that is the practical equivalent of life without parole." Id. at 446-47. Nevertheless, and significantly for our purposes, the Court has consistently limited its application to children. In State v. Ryan, 249 N.J. 581, 596 (2022), the Court reviewed its decision in Zuber and reaffirmed Miller did not apply to defendants sentenced for crimes committed when they were over the age of eighteen.

Here, although defendant was young at the time of the offense, he was an adult. See N.J.S.A. 2A:4A-22(a) (defining a juvenile as an individual under the age of eighteen). Defendant's claim that he is entitled to the protections afforded

by <u>Miller</u> and <u>Zuber</u> because he was an "emerging adult" at the time the crimes were committed has no basis in the law.[5]

Defendant also notes his score on the TONI-4 test, which he took in connection with his evaluation pursuant to the Sex Offender Act, N.J.S.A. 2C:47-1 to -10, and contends the imposition of the parole bar is cruel and unusual because of his diminished "intellectual functioning." He cites to <u>Atkins</u> <u>v. Virginia</u>, 536 U.S. 304 (2002), where the U.S. Supreme Court held the Eight Amendment prohibits states from executing offenders with mental disabilities. <u>Id.</u> at 307, 327.

Defendant's argument is unpersuasive. First, <u>Atkins</u> applies to death penalty cases. Defendant cites to no law where the considerations of <u>Atkins</u> are applicable to other sentences or parole disqualifiers. Further, the record does not establish defendant's alleged diminished intellectual functioning. Although he scored in the "poor" range on a test for nonverbal intelligence, the record does not demonstrate defendant had "significant limitations in adaptive skills such as communication, self-care, and self -direction." <u>Atkins</u>, 536 U.S. at 318.

---

[5] Mitigating factor 14 was adopted in 2020, after this case was tried in 2019. Because defendant was sentenced prior to the effective date of mitigating factor 14, it does not apply. <u>See</u> <u>State v. Lane</u>, 251 N.J. 84 (2022) (Mitigating factor 14 does not apply retroactively.)

A-0101-20

To the contrary, the record reflects defendant had maintained employment in construction and was able to testify in his own defense. Therefore, neither defendant's age nor intellectual capacity are a bar to the imposition of the Legislature's mandatory twenty-five-year parole bar.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0101-20