# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3549-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LARRY BOSTIC,

    Defendant-Appellant.

_____

> Submitted October 24, 2023 – Decided March 14, 2024
>
> Before Judges Sumners, Rose and Perez Friscia.
>
> On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-09-0834.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Jack L. Weinberg, Designated Counsel, on the briefs).
>
> Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Cody A. Dooley, Assistant Prosecutor, of counsel and on the brief).
>
> Appellant filed a pro se supplemental brief.

PER CURIAM

A jury found defendant Larry Bostic guilty of five counts of fourth-degree invasion of privacy, N.J.S.A. 2C:14-9(b)(2), and five counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), relating to five victims, N.B., G.S., A.S., K.G., and J.P., whom he employed.[1]  Defendant was later sentenced to an aggregate prison term of nine years, with parole supervision for life, N.J.S.A. 2C:43-6.4(a).

Before us, defendant contends:

> POINT I
>
> THE DEFENDANT DID NOT HAVE A LEGAL DUTY FOR THE CARE OF HIS JUVENILE EMPLOYEES AND HAD NOT ASSUMED RESPONSIBILITY FOR THEIR CARE NECESSARY FOR ENDANGERING THE WELFARE OF A CHILD PURSUANT [TO] N.J.S.A 2C:24-4(a)(l).  THE COURT SHOULD HAVE SUA SPONTE DISMISSED THE SECOND-DEGREE CHARGES. (Partially Raised Below).
>
> POINT II
>
> THE STATE FAILED TO PRESENT SUFFICIENT FACTS TO ESTABLISH THAT THE DEFENDANT'S CONDUCT CONSTITUTED SEXUAL CONDUCT. THE TRIAL COURT SHOULD HAVE SUA SPONTE DISMISSED THE COUNTS CHARGING ENDANGERING THE WELFARE OF CHILDREN. (Partially Raised Below).

---

[1] We use initials to protect the confidentiality and identity of the minor victims. R. 1:38-3(c)(9).

2

POINT III

THE COURT GAVE ERRONEOUS AND INCONSISTENT INSTRUCTIONS TO THE JURY CONCERNING THE STATE'S BURDEN OF PROOF CREATING CONFUSION AND PLAIN ERROR. THE DEFENDANT'S CONVICTIONS MUST BE REVERSED.  (Not Raised Below).

POINT IV

THE COURT ERRED IN ALLOWING IN TESTIMONY UNDER N.J.R.E. 404(b) WHICH REFERENCED PHOTOGRAPHS CONTAINED ON THE CELLPHONE THAT PREDATED THE BURGLARY IN MARCH 2017.  IN THE ALTERNATIVE, EVEN IF THE TESTIMONY WAS PROPERLY ADMITTED THE COURT'S LIMITING INSTRUCTION WAS FLAWED BECAUSE IT PERMITTED THE JURY TO CONSIDER THE EVIDENCE TO ESTABLISH SEXUAL CONDUCT WHICH WAS NOT THE BASIS FOR THE EVIDENCE.  THE COURT'S CHARGE IMPROPERLY REFERENCED "OTHER CRIMES" WHEN NO SUCH OTHER CRIMES WERE ESTABLISHED BY THE STATE.  THE CURATIVE INSTRUCTION HAD THE EFFECT OF DIRECTING A GUILTY VERDICT.

POINT V

THROUGHOUT THE TRIAL THE STATE DISPARAGED THE DEFENDANT DEPRIVING HIM OF A FAIR TRIAL.  THE PROSECUTOR'S ACTIONS CONSTITUTED PROSECUTORIAL MISCONDUCT.  (Partially Raised Below).

3

POINT VI

THE COURT ERRED WHEN IT RULED
ADMISSIBLE INCULPATORY COMMENTS MADE
BY . . . DEFENDANT IN RESPONSE TO THE
DETECTIVES IN VARIOUS CUSTODIAL
SETTINGS ELICITING INCULPATORY
INFORMATION.

A. The Defendant's Constitutional Rights Were
Violated During The Custodial Interrogation At
The Ice Cream Parlor Regarding The Ownership
Of The Cell[p]hone Seized.

B. The Defendant's Constitutional Rights Were
Violated When The Detectives Conducted A
Custodial Interrogation At Police Headquarters.

POINT VII

THE COURT IMPOSED AN EXCESSIVE
SENTENCE THAT DID NOT TAKE INTO
CONSIDERATION ALL APPROPRIATE CODE
SENTENCING GUIDELINES.

In a self-represented brief, defendant also contends that the warrant issued to search his premises was invalid because the police allegedly altered the warrant's execution hours.

Having considered the parties' arguments, the record, and the applicable law, we affirm defendant's convictions for fourth-degree invasion of privacy. We, however, reverse the convictions for second-degree endangering the welfare of a child, and remand to the trial court to mold the convictions to lesser-

4

included offenses of third-degree endangering the welfare of a child because there was no evidence the victims were under defendant's care to sustain a second-degree offense. On remand, the court shall resentence defendant accordingly.

I.

In the summer of 2017, defendant, then sixty-five years old, owned an ice cream shop in Vineland, employing the victims, knowing they were between the ages of fourteen and fifteen. The victims worked for defendant for only a few days or a week at most. They were compensated by splitting the sales receipts for the shifts they worked, and were allowed to consume ice cream, snacks, and drinks without payment.

When defendant hired some of the victims, he required them to try on several skirts, their required work uniform, in a changing room of the ice cream shop. After putting on the skirts, defendant made them turn around, so he could see them from the rear. N.B. stated the skirts were so short that when they bent over, "[y]ou would see everything" underneath, meaning her underwear. The victims were uncomfortable wearing the skirts, so some wore shorts underneath. However, J.P., G.S., A.S., and K.G. testified that defendant told them they were not allowed to wear their shorts. The victims were not provided a uniform shirt

to wear with the skirt, even though they only served customers through the shop's window, thereby obscuring view of the skirt.

The victims were not permitted to take the skirts home. At the beginning and end of their shifts, defendant told them to change into and out of their clothes, insisting they use the shop's changing room instead of the bathroom. He also insisted the victims use the changing room one at a time. The victims noticed each time they used the changing room, defendant entered his office, which he kept locked, and closed the door. They were not allowed to go into his office.

The victims testified they felt uncomfortable around defendant. He stared at them, particularly when they bent over in their skirts. Instead of calling them by their names, defendant referred to them as "pretty" or "beautiful"; telling J.P., G.S., and K.G. they looked "exotic." N.B. claimed defendant touched her hand, winked at her, and told her he "hope[d] nobody else would come into work" so he could be with her by himself and asked her if she wanted to ride in his car. According to G.S., defendant "always creeped us out."

One day, N.B. and J.P. suspected defendant was viewing them in the changing room because they entered the room together while defendant "was in his office already, and he started yelling at [them], telling [them] only one girl

6

at a time" should be in the room. They "started thinking . . . how does he know that it was two of us if he's in his room, [when he's] nowhere near us or the fitting room?" After N.B. and her mother reported the incident to the Vineland police, an investigation was initiated.

Two days later, the police executed a search warrant at the ice cream shop. They confiscated defendant's cellphone from his person[2] and a key to his office. In the changing room, the police found uniform skirts and a fake thermostat on the wall, containing a camera along with wiring that led to a VHS recording device in defendant's office. VHS tapes revealed the camera recorded the girls while they changed into and out of their uniform skirts. At trial, the video was shown to the jury. The victims were unaware there was a camera in the changing room recording them, and testified they would not have used the changing room if they knew they were being recorded.

After defendant was arrested and <u>Mirandized</u>,[3] he gave Vineland Police Detective Louis Rodriguez a video-recorded statement, which was played to the jury. Defendant admitted installing the camera in the changing room and recording the victims while they changed. He claimed he installed the camera

---

[2] The cellphone was a prepaid phone and not registered to defendant.

[3] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-3549-19

in March 2017, upon the advice of the police after the shop had been burglarized and out of concern his employees were stealing. He also claimed he told the girls to wear shorts underneath the skirts.

Upon examining defendant's cellphone, the police discovered still photos of the victims, in various stages of undress, apparently reproduced from the changing room camera footage. The photos were sometimes cropped to focus on the girls' private parts, but the police were able to identify the victims based upon their underwear. Similar photos—taken in the changing room before the March 2017 burglary that defendant claimed prompted him to install the camera and depicting different girls—were also retrieved from the cellphone, revealing "images of intimate parts being exposed, clothed." However, the police were not able to identify anyone from these earlier photos, and no charges were brought based upon those earlier photos.

## II.

Defendant did not move at the close of evidence to dismiss any of the charges, R. 3:18-1, or after the verdict, R. 3:18-2, to vacate the convictions for second-degree endangering the welfare of a child. However, he contends in Point I, the trial court should have sua sponte dismissed the second-degree charges or vacated the convictions on the basis that he did not have a legal duty

for the care of the underaged victims as required by N.J.S.A. 2C:24-4(a)(1). We agree that proof of the second-degree offenses was not sustained. But we disagree the court was sua sponte required to vacate defendant's convictions. Instead, the court should have molded the verdict and entered a judgment of conviction (JOC) on the lesser-included offenses of third-degree endangering the welfare of a child.

> Endangering the welfare of a child occurs where:
>
> > Any person having <u>a legal duty for the care of a child or who has assumed responsibility for the care of a child</u> who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree. Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.
>
> [N.J.S.A. 2C:24-4(a)(1) (emphasis added).]

Thus, where the defendant does not " hav[e] a legal duty for the care of a child" or has not "assumed responsibility for the care of a child," a third-degree endangering the welfare of a child is committed if there is evidence of sexual conduct. <u>State v. Saad</u>, 461 N.J. Super. 517, 523, 529-30 (App. Div. 2019) (citation omitted).

The trial record does not indicate defendant's relationship with the victims amounted to a legal duty of care or an assumption of responsibility for their care.

9 <span>A-3549-19</span>

Defendant "was [not] the parent, guardian or otherwise [stood] in loco parentis," State v. Hackett, 166 N.J. 66, 76-77 (2001) (italicization omitted), nor did he "assume[] a general and ongoing responsibility for the care of the [victims]," either through formal, legal arrangements, or through informal arrangements like "cohabitation with the [victims'] parent," State v. Galloway, 133 N.J. 631, 661 (1993). Defendant simply had an employer-employee relationship with the victims during the brief time they worked at his ice cream shop. The victims never viewed him as a parent or someone who had responsibility over their care.

Defendant's relationship with the victims was unlike that of the defendant high school baseball coach in State v. McInerney, 428 N.J. Super. 432, 443 (App. Div. 2012). In McInerney, we held the record showed the defendant's relationship with his underaged players constituted responsibility for their care because he "supervised . . . [them], who trusted and admired him, on a regular and continuing basis, over extended periods of time and in matters generally committed to a child's parents." Ibid. We concluded the defendant "assumed the role of a regular and primary supervisor in matters particularly suitable for parental oversight and wholly unrelated to performance and behavior on the playing field." Id. at 444.

Defendant's relationship is more like that of the defendant pediatric surgeon in Saad, where we held the defendant had not assumed a legal duty of care towards his underaged patients. 461 N.J. Super. at 527. We concluded the defendant could not be charged with second-degree endangering the welfare of a child because "[w]hile [the defendant] had a professional obligation to provide appropriate medical treatment to his patients, an obligation he utterly violated if the State's allegations [were] proven true [at trial], [the] defendant did not assume a general and ongoing responsibility for their care within the meaning of N.J.S.A. 2C:24-4(a)(1)." Ibid.

The State's position that defendant had a legal duty of care towards the victims to qualify his conduct as second-degree endangering the welfare of a child does not hold water. The State argues defendant had a "legal duty" or "assumed responsibility" with respect to the victims under N.J.S.A. 2C:24-4(a)(1) because: defendant had supervisory authority over them as their employer; the victims trusted defendant enough to follow his directions as to "how, when, and where to change" and to consume the shop's food and drink; the victims depended on defendant for their wages; and defendant obtained permission from the victims' parents for them to work at his shop. Defendant's position, as the victims' employer, was far from the relationship needed to

11

establish second-degree endangering the welfare of a child. There is no evidence he was more than the person who hired and supervised the victims during the hours they worked. There is no evidence the victims looked to defendant to care for their welfare beyond their duties at the ice cream shop. To hold otherwise would undermine the legislative goal of imposing harsher penalties for individuals who have assumed responsibility for the care of a child due to "the profound effect on the child when the harm is inflicted by a parental figure in whom the child trusts." Galloway, 133 N.J. at 661. Because there was no trusting relationship between the victims and defendant, the convictions for second-degree endangering the welfare of a child should be vacated.

Defendant's conduct, however, constituted the lesser-included offense of third-degree endangering the welfare of a child because he "engage[d] in sexual conduct which would impair or debauch the morals of the child." N.J.S.A. 2C:24-4(a)(1). Defendant's JOC should be amended to reflect convictions for five counts of third-degree endangering the welfare of a child because: (1) defendant was afforded his right to trial; (2) other than the duty element of second-degree child endangerment, all other elements of the third-degree and second-degree offenses are the same; (3) defendant's guilt of the lesser-included

12

offense is implicit in, and part of, the jury verdict;[4] and (4) we discern no undue prejudice to defendant.  State v. R.P., 223 N.J. 521, 528 (2015); see also N.J.S.A. 2C:1-8(d)(1).  We therefore remand for the trial court to amend the JOC, mold the verdict to reflect convictions for five counts of third-degree endangering the welfare of a child, and resentence defendant accordingly.

## III.

In Point II, defendant argues the State failed to prove his conduct constituted "sexual conduct which would impair or debauch the morals of the child" to sustain a conviction of either second- or third-degree endangering the welfare of a child.  N.J.S.A. 2C:24-4(a)(1).  He maintains his behavior was not "sexual conduct" as there was no evidence he intended to act on the photographs or share them with the victims or anyone else.  In addition, defendant asserts that referring to the victims as "pretty" or "exotic" and touching N.B.'s hand and offering to take her on a ride in his car was not sexual conduct.  We disagree.

Sexual conduct is not defined in N.J.S.A. 2C:24-4(a)(1).  State in re D.M., 238 N.J. 2, 18 (2019).  Still, our case law has identified situations which constitute sexual conduct.  The phrase "clearly include[s] sexual assaults and

---

[4]  The jury was charged on both the second-degree offense and the lesser-included third-degree offense.

sexual contact[.]" State v. Perez, 177 N.J. 540, 553 (2003) (second alteration in original) (quoting State v. Perez, 349 N.J. Super. 145, 153 (App. Div. 2002)). In addition, sexual conduct has been interpreted to criminalize a behavior that is neither a sexual assault nor sexual contact, such as a defendant: masturbating in public, State v. Zeidell, 154 N.J. 417, 434-35 (1998); being nude in a window where the defendant could be seen by children, State v. Hackett, 323 N.J. Super. 460, 472 (App. Div. 1999), aff'd as modified, 166 N.J. 66 (2001); offering to pay children to report their sexual activities, McInerney, 428 N.J. Super. at 451; engaging in a telephone conversation with children about their private parts, oral sex, and other similar topics, State v. Maxwell, 361 N.J. Super. 502, 517-18 (Law Div. 2001), aff'd o.b., 361 N.J. Super. 401 (App. Div. 2003); asking a child to send a photo of her breasts, State v. Johnson, 460 N.J. Super. 481, 499 (Law Div. 2019); flashing private parts to children, State v. South, 136 N.J. Super. 402, 405, 410 (App. Div. 1975) (affirming the defendant's conviction for the now-repealed offense of "impairing the morals of a minor"); showing nude photos to a child, State v. White, 105 N.J. Super. 234, 237 (App. Div. 1969) (same). These cases involve situations in which the defendants solicited children to view or engage in some sexual conduct or put themselves in a position knowing children could view their sexual conduct.

14

Moreover, sexual conduct has been found based on the defendant's intent to lure a child to ride in his car. See Perez, 177 N.J. at 553-56. In Perez, the Court held there was sufficient evidence to prove attempted endangering the welfare of a child where the defendant had tried to lure the child victim into his vehicle by twice asking her if she wanted a ride, and later admitted to the police his reason for doing so was his physical attraction to the child. Id.

While none of these non-sexual assault or non-sexual contact situations occurred here, the facts were sufficient to permit a reasonable jury to conclude defendant's actions towards the victims constituted "sexual conduct which would impair or debauch the morals" under N.J.S.A. 2C:24-4(a)(1). Defendant required the victims to model skirts for him as part of his job interviewing process and to wear the skirts as work uniforms without wearing shorts underneath even though the skirts were so short that their underwear and buttocks showed whenever they leaned over. Defendant directed the victims to change into and out of the skirts, only one-at-a-time, and exclusively in the changing room of the ice cream shop. While changing, he would watch the victims via a video camera hidden in a fake thermostat in the changing room. He would also take cellphone pictures of the recordings. Further, the victims felt defendant was "creepy" because he persistently refrained from using their

names and instead referred to them as "beautiful" or "exotic." He also touched N.B.'s hand and asked N.B. to take a ride with him in his car. Lastly, defendant's statement to the police that he installed the hidden camera in the changing room after the March 2017 burglary was proven false by the existence of similar photos taken prior to March 2017.

The jury was properly instructed to determine whether the sexual conduct element of endangering the welfare of a child prescribed by N.J.S.A. 2C:24-4(a)(1) was proven by the State beyond a reasonable doubt. And they could reasonably glean from the facts that defendant's purpose was to view, record, and maintain the recordings for his sexual gratification. Given the court's instructions and the victims' testimony, the jury could reasonably find defendant's conduct was sexual and would impair or debauch the morals of the victims. Hence, there is no merit in defendant's assertion that his actions towards the victims did not constitute endangering the welfare of a child.

IV.

In Point III, defendant contends for the first time on appeal that his convictions should be vacated because the jury instructions caused confusion regarding the State's burden of proof. He points only to the trial court's instruction on invasion of privacy that: "If you find that the State has failed to

16

prove each element beyond a reasonable doubt, then you must find . . . defendant not guilty." Defendant claims the language is erroneous because the court instructed the jury that it must find reasonable doubt as to all elements of invasion of privacy to find him not guilty.

Considering the instructions "as a whole," State v. A.L.A., 251 N.J. 580, 591 (2022), we conclude the court properly instructed the jury that the State bore the burden of proof beyond a reasonable doubt as to each element of each crime charged. We therefore discern no error, let alone plain error. R. 2:10-2 Thus, defendant's challenge to the jury instructions is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

V.

In Point IV, defendant contends "the court erred in allowing in testimony under N.J.R.E. 404(b), which referenced photographs contained on the cellphone that predated the burglary in March 2017." Alternatively, he contends the court erred in its limiting instruction concerning the evidence. He claims the instruction "[effectively] direct[ed] a guilty verdict" because: (1) it "permitted the jury to consider the evidence to establish sexual conduct when the original purpose for the evidence was to refute . . . defendant's claim that he placed the hidden camera in the changing area at the instruction of the police[,]

. . . demonstrat[ing] knowledge, preparation and motive"; and (2) "the court's charge improperly referenced 'other crimes' when no such crimes were established" by the State.  We are unpersuaded.

An appellate court gives "great deference" to "a trial judge's determination on the admissibility of 'other bad conduct' evidence."  State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010) (citing State v. Foglia, 415 N.J. Super. 106, 122 (App. Div. 2010)).  In evaluating a trial court's evidentiary decision, we apply an abuse of discretion standard; there must be a "clear error of judgment" to overturn the trial court's determination.  State v. Castagna, 400 N.J. Super. 164, 182-83 (App. Div. 2008) (quoting State v. DiFrisco, 137 N.J. 434, 496 (1994)).

N.J.R.E. 404(b)(2) provides that evidence of other crimes or bad acts is generally not admissible unless used for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute."  The concern in admitting evidence of other crimes is that "the jury may convict the defendant because he is a bad person in general."  State v. Cofield, 127 N.J. 328, 336 (1992) (internal quotation marks omitted).  "[O]ther crimes evidence may be admissible if offered for any non-propensity purpose, [including] the need to

provide necessary background information about the relationships among the players" involved. State v. Rose, 206 N.J. 141, 180-81 (2011) (alteration in original) (emphasis, internal quotation marks, and citations omitted). The evidence is not required to prove or disprove a fact at issue but need only support a desired inference. State v. Swint, 328 N.J. Super. 236, 252-53 (App. Div. 2000).

In Cofield, our Supreme Court set forth a four-pronged test to govern the admission of such evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b) and 609(a), 38 Emory L.J. 135, 160 (1989)).]

See also State v. Carlucci, 217 N.J. 129, 140-41 (2014) (reaffirming the Cofield test). Our Supreme Court has also explained that the second Cofield prong "need

not receive universal application in [N.J.R.E.] 404(b) disputes." State v. Williams, 190 N.J. 114, 131 (2007).

Once N.J.R.E. 404(b) evidence is found admissible, "the court must instruct the jury on the limited use of the evidence." Cofield, 127 N.J. at 340-41. "[T]he court's instruction 'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.'" Id. at 341 (quoting State v. Stevens, 115 N.J. 289, 304 (1989)).

Here, after conducting an N.J.R.E. 104 hearing, the court reserved decision and thereafter issued an oral decision barring admission of the photos. However, in applying the Cofield factors and given the limiting instruction to the jury, the court ruled the investigating police officer could testify that there were photos found on defendant's cellphone depicting young girls in the ice cream shop's changing room before March 2017—similar to the photos of the victims. The court ruled that N.J.R.E. 404(b) testimony was admitted to show defendant's "plan," "preparation," "intent," "motive," "absence of mistake," and "the fact that he indicated that he only put the camera in there following the burglary."

Based on the State's evidence, the court, mirroring the model jury charges,[5] instructed the jury:

> [T]he [S]tate[] introduced evidence that law enforcement discovered other photos on . . . defendant's cell[ ]phone which were similar to those which have been introduced into evidence before today, which predate the date alleged in the [i]ndictment and, also, predated [the] March 24, 2017 burglary, as indicated by . . . defendant during his statement.
>
> Now, normally, such evidence is not permitted under our Rules of Evidence. Our Rules, specifically, exclude evidence that a defendant has committed other crimes, wrongs or acts when it is offered only to show that he has a disposition or a tendency to do wrong and, therefore, must be guilty of the charged offenses.
>
> Before you can give any weight to this evidence, you must be satisfied that . . . defendant committed the other wrongs, crimes[,] or acts. If you're not so satisfied you may not consider it for any purpose.
>
> However, our Rules do permit evidence of other crimes, wrongs, or acts when the evidence is used for certain specific narrow purposes, such as, to establish or demonstrate motive, opportunity, intent, preparation, planned knowledge, absence of mistake or accident.
> In this case, the State is going to be required to establish that . . . defendant was not licensed or privileged to photograph or videotape the undergarment clad intimate parts of the [victims] with regard to the charges involving invasion of privacy in the Indictment.

---

[5] Model Jury Charge (Criminal), "Proof of Other Crimes, Wrongs or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016).

A-3549-19

In addition, the State is going to be required to establish that defendant engaged in sexual conduct which would impair or debauch the morals of a child.

You may consider the testimony of the [d]etective for the limited purposes of the State's requirement to establish that he was not licensed or privileged to photograph or videotape the children.

Furthermore, you may consider the testimony in support of the State's requirement to establish that the purpose of . . . defendant's conduct was to engage in sexual conduct.

Whether this evidence does, in fact, demonstrate the limited purposes for which the evidence is offered is for you to decide.  You may decide that the evidence does not demonstrate those purposes and is not helpful to you, at all.  In that case, you must disregard the evidence.  On the other hand, you may decide that the evidence does demonstrate those purposes and use it for that specific purpose.

However, you may not use this evidence to decide that . . . defendant has a tendency to commit crimes or that he is a bad person.  That is, you may not decide that just because . . . defendant has committed other crimes, wrongs[,] or acts that he must be guilty of the present crimes.

I've admitted the evidence only to help you decide the specific question of whether . . . defendant was licensed or privileged to photograph or videotape the [victims] and whether this purpose constitutes sexual conduct which would impair or debauch the morals of the [victims].  You may not consider it for any other purpose and may not find . . . defendant guilty

22

now, simply, because the State has offered evidence
that he committed the other crimes, wrongs[,] or acts.

In its final instructions, the court repeated virtually word-for-word, the 404(b) limiting instruction issued after the officer's testimony.

Contrary to defendant's contention, the court fully complied with its obligations. The court correctly found the evidence satisfied the Cofield test. The evidence was: relevant to prove the criminal charges and to rebut the defense; similar in kind and reasonably close in time to the offenses charged; clear and convincing; considered for its probative value versus its apparent prejudice; and sanitized by allowing only testimony about the photos, without admitting the photos in evidence. Finally, the court issued limiting instructions at the time the evidence was admitted and in the final charge, directing the jury how it must consider the evidence.

In conclusion, admission of the testimony of the pre-March 2017 photos served two purposes consistent with N.J.R.E. 404(b). It impeached defendant's statement to the police justifying the hidden camera installation for an innocuous reason. It tended to establish the sexual nature of defendant's conduct, that is, the sexual nature of his plan, motive, or intent in filming and photographing the victims as they changed into and out of their uniforms. Moreover, the probative value of the cellphone photos outweighed their potential prejudice.

23

## VI.

In Point V, defendant contends he was deprived of a fair trial due to the prosecutor's misconduct: (1) referring to him as "a wolf in sheep's clothing" and "predator" in the opening and closing statements; (2) eliciting testimony from investigating Vineland Police Detective Charles Mackafee that defendant exhibited "offender type control [and] wants to control everything"; and (3) eliciting testimony from Rodriguez that defendant had not provided "truthful" information about when he installed the hidden camera. Defendant claims these errors warrant a new trial.

## A.

To warrant a new trial for prosecutorial misconduct, the conduct must have been "'clearly and unmistakably improper,' and substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Smith, 167 N.J. 158, 181-82 (2001) (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)). We must assess "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial." Timmendequas, 161 N.J. at 575. In doing so, "we consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they

24

occurred." Ibid. (citing State v. Scherzer, 301 N.J. Super. 363, 433 (App. Div. 1997)).

"Prosecutors 'are afforded considerable leeway in making opening statements and summations,'" State v. Echols, 199 N.J. 344, 359-60 (2009) (quoting State v. Williams, 113 N.J. 393, 447 (1988)), and "are expected to make vigorous and forceful closing arguments to juries," State v. Frost, 158 N.J. 76, 82 (1999). Nonetheless, a prosecutor's "summation is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom." Swint, 328 N.J. Super. at 261 (citing State v. Feaster, 156 N.J. 1, 58-59 (1998)).

In evaluating claims of prosecutorial misconduct, we examine: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Frost, 158 N.J. at 83 (collecting cases). If no objections to the remarks were made at trial, they generally will not be deemed prejudicial. Ibid. The failure to object to such remarks "also deprives the court of an opportunity to take curative action." Id. at 84.

Without an objection, the defendant must establish the prosecutor's conduct constitutes plain error, State v. Feal, 194 N.J. 293, 312 (2008), meaning

we must determine if there was an error that was "clearly capable of producing an unjust result," R. 2:10-2. Reversal is required if the error is "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Green, 447 N.J. Super. 317, 325 (App. Div. 2016) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

B.

In her opening, the prosecutor briefly remarked that defendant was "a wolf in sheep's clothing," meaning "a dangerous person who is pretending to be harmless." In closing, the prosecutor commented that defendant was "a wolf in sheep's clothing, a predator," explaining he "preyed upon five unsuspecting teenage girls who were excited and happy for the opportunity to have their first jobs and make money for themselves," and "[w]hat they got instead was . . . defendant, an employer who was driven by his own sexual gratification." Because defendant did not object to these opening and closing remarks, we review for plain error. We find none.

The opening comments were more appropriate for closing because "[t]he fundamental purpose of opening statements is 'to do no more than inform the jury in a general way of the nature of the action and the basic factual hypothesis projected, so that they may be better prepared to understand the evidence."

Szczecina v. PV Holding Corp., 414 N.J. Super. 173, 177-78 (App. Div. 2010) (emphasis added) (quoting Amaru v. Stratton, 209 N.J. Super. 1, 15 (App. Div. 1985)) (internal quotation marks omitted); see also Echols, 199 N.J. at 360 ("prosecutors should limit comments in the opening to the 'facts [they] intend[ ] in good faith to prove by competent evidence,'"(alterations in original) (quoting State v. Hipplewith, 33 N.J. 300, 309 (1960))).

Here, the prosecutor's comments were essentially an editorial view of the facts sought to be proven. Nonetheless, the fleeting reference did not infect the trial by prejudicing defendant before the jury. Moreover, then and at closing, the prosecutor explained the characterization was grounded in evidence to discredit defendant's explanations for his behavior.

While the prosecutor's wolf imagery and predator accusations were evocative, they did not constitute an ad hominem attack on the defense and were not unfairly prejudicial. Other jurisdictions have rejected similar contentions of prosecutorial misconduct. State v. Goudeau, 372 P.3d 945, 989-90 (Ariz. 2016) (finding harmless error in "wolf in sheep's clothing" remark made in opening statement and in summation); State v. Beasley, 108 N.E.3d 1028, 1053-54 (Ohio 2018) (finding no error in "wolf in sheep's clothing" opening statement "to make the point that [the defendant] lured his victims by pretending to offer them jobs,

which constitutes 'fair comment' on the evidence"); <u>People v. Ivory</u>, 776 N.E.2d 763, 772-73 (Ill. App. Ct. 2002) (finding "wolf in sheep's clothing" remark, made in summation, to be improper but not warranting reversal).

Defendant's method of employing the young teen victims, requiring them to wear skimpy skirt uniforms, and change into the skirts in a room under the view of a secreted camera supports the prosecutor's characterization of defendant's conduct. The comments fell within the wide latitude accorded the prosecutor in summation and did not substantially prejudice defendant's fundamental right to have a jury fairly assess his case. They do not warrant a new trial.

## C.

While testifying about defendant's post-arrest statement, the prosecutor asked Mackafee about his post-arrest interview interactions with defendant. In responding to why he allowed defendant, without interruption, to do most of the talking, Mackafee responded: "Because that's the psychological profile of [defendant]." When the prosecutor asked, "what do you mean by that?" Mackafee responded: "His offender type control – wants to control everything." The court did not respond to defendant's objection.

Mackafee's reference to defendant's "offender type" was problematic to the extent that it implied defendant's guilt. See State v. Trinidad, 241 N.J. 425, 444-47 (2020); State v. Frisby, 174 N.J. 583, 593-94 (2002). However, the incident was so insignificant in light of the entire trial record that defendant was not deprived of a fair trial based upon this one piece of testimony.

D.

Rodriguez testified that defendant claimed he installed the hidden camera after a March 2017 burglary, but the detectives found photos on defendant's cellphone predating the burglary. In response to the prosecutor's questions regarding the truthfulness of defendant's statement about when he installed the camera, Rodriguez indicated the statement was not true, with no objection from defendant. The prosecutor then asked Rodriguez to explain "why," to which Rodriguez pointed to the cellphone images taken before March 2017.

Ordinarily, police officers testifying as fact witnesses in criminal cases are not permitted to offer their opinions with respect to defendants' guilt or innocence. See State v. Frisby, 174 N.J. 583, 593-94 (2002). More generally, our Supreme Court has noted a witness is not permitted to express an opinion about another witness's credibility. Id. at 595-96; cf. State v. Kemp, 195 N.J. 136, 156-57 (2008) (finding the police officer's opinion about the defendant's

truthfulness during his confession did not rise to the level of plain error on the grounds that the defendant elicited the opinion during cross-examination, defendant's concern was not the officer's opinion of his truthfulness but rather the basis for the officer's belief, and because the officer did not express an opinion as to the defendant's guilt).

Like Kemp, the officer here did not express an opinion about defendant's ultimate guilt. Rather, Rodriguez's testimony regarding the truthfulness of defendant's statement about when he installed the hidden camera was consistent with the court's N.J.R.E. 404(b) ruling. The prosecutor's examination restricted the detective's testimony to establish the limited basis for the jury's consideration of the pre-March 2017 photos found on defendant's cellphone. Pointing out that defendant was untruthful was relevant to establishing defendant's guilt of the crimes charged and to impeaching his statement regarding why and when he installed the hidden camera.

Consistent with the model jury charge, during its final instructions, the court informed the jurors: "[A]s judges of the facts you are to determine the credibility of the various witnesses, as well as the weight to be attached to their testimony. You, and you alone, are the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to

the testimony of each witness."  See Model Jury Charges (Criminal), "Criminal Final Charge" (rev. Sept. 1, 2022).

In sum, the photos taken prior to the March 2017 burglary clearly contradicted defendant's statement, and as with all testimony adduced at trial, the jury was free to accept or reject Rodriguez's brief exchange with the prosecutor concerning defendant's truthfulness, which did not draw an objection. No unjust result occurred, causing the jury to reach a guilty verdict that it otherwise might not have rendered.

## VII.

In Point VI, defendant contends his inculpatory comments to the detectives during the custodial setting should not have been admitted. Specifically, he argues the court erred because his statements:  (1) to Mackafee during the search warrant execution that the cellphone seized from his person belonged to him were inadmissible given the failure to issue Miranda[6] warning as he was "functionally under arrest"; and (2) to detectives at headquarters because police left him alone for thirty-eight minutes before questioning him after issuing his Miranda rights.

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

A.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, [Rule] 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "The administration of Miranda warnings ensures that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." State v. A.M., 237 N.J. 384, 397 (2019). To that end, a person subject to custodial interrogation "must be adequately and effectively apprised of [their] rights." Nyhammer, 197 N.J. at 400 (quoting Miranda, 384 U.S. at 467).

Before any evidence acquired through a custodial interrogation can be used against a defendant, "[t]he burden is on the prosecution to demonstrate not only that the individual was informed of [their] rights, but also that [they] . . . knowingly, voluntarily, and intelligently waived those rights." Id. at 400-01. Thus, "the State shoulders the burden of proving . . . that a defendant's confession was actually volunteered and that the police did not overbear the will of the defendant." State v. Hreha, 217 N.J. 368, 383 (2014). In turn, the trial court must determine whether the State has satisfied its heavy burden by proof

"beyond a reasonable doubt," State v. Yohnnson, 204 N.J. 43, 59 (2010) (alteration in original) (quoting State v. Presha, 163 N.J. 304, 313 (2000)), based upon the "totality of the circumstances," Nyhammer, 197 N.J. at 405.

A "totality-of-the-circumstances analysis" requires the court to "consider such factors as the defendant's 'age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Id. at 402 (quoting Presha, 163 N.J. at 313). While an investigator's "manipulative or coercive" statements may deprive a defendant "of his ability to make an unconstrained, autonomous decision to confess[,]" State v. Di Frisco, 118 N.J. 253, 257 (1990), "[e]fforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne,'" State v. Maltese, 222 N.J. 525, 544 (2015) (citation omitted).

"Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" S.S., 229 N.J. at 374 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)); see, e.g., State v. Dorff, 468 N.J. Super. 633, 643-44 (App. Div. 2021). This court must "accept the trial court's factual findings unless they are not supported by sufficient

credible evidence in the record." Dorff, 468 N.J. Super. at 644. "In contrast, we review the trial court's legal conclusions de novo." Ibid. "Accordingly, [this court] [is] not bound by a trial court's interpretations of the legal consequences that flow from established facts." Ibid.

Moreover, "a trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court or because it would have reached a different conclusion." S.S., 229 N.J. at 374. Indeed, "[a]n appellate court should not disturb a trial court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'" Ibid. (quoting Gamble, 218 N.J. at 425). This deferential standard of appellate review also applies to the trial court's "factual findings based on a video recording or documentary evidence." Id. at 381.

B.

At a Miranda hearing, the trial court reviewed defendant's video-recorded statement and heard testimony from Mackafee. The court was made aware that prior to giving his statement, defendant was left alone in an interrogation room for thirty-eight minutes. After Mackafee entered the room and inquired about defendant's health, defendant interrupted, asking "Can I say something?"

Defendant began telling Mackafee that he had installed cameras after a burglary at his shop four or five months earlier. Mackafee interrupted defendant and advised him of his <u>Miranda</u> rights. Before defendant initialed the <u>Miranda</u> acknowledgment and waiver form, he continued speaking about the cameras he installed. As soon as he finished initialing the form, defendant asked, "Can I continue?" to which Mackafee responded, "Yes, sir." Defendant then admitted installing the camera in the changing room, observing the victims change into and out of their uniform skirts, and recording it. He insisted the camera was installed only after the March 2017 burglary to catch anyone stealing from him.

As for the execution of a search warrant at defendant's premises, Mackafee responded to the prosecutor's direct examination as follows:

> Q. Detective, you executed the search warrant at the Cool Breeze Ice Cream Parlor, correct?
>
> A. Yes, sir.
> Q. And as a result of that – well, first of all, when you and your fellow officers arrived to execute the warrant, [defendant] wasn't free to leave, is that correct.
>
> A. That's correct.
> Q. And at some point, you arrested [defendant] and took him back to the police headquarters for questioning and processing, is that correct?
>
> A. Yes.

A-3549-19

Q. And according to your report, when you arrested [defendant], you found a cellphone on him, is that correct?

A. Yes, sir.

Q. And you asked him if it was his, is that correct?

A. Yes.

Q. And then you seized that phone, is that correct.

A. Yes, sir.

Thereafter, Mackafee stated defendant was not arrested "on the scene," but was charged and arrested after he gave his recorded statement at the police station. The most reasonable understanding of Mackafee's somewhat contradictory testimony is that the police arrested defendant at the scene after executing the search warrant and discovering the hidden camera and recording equipment. However, defendant was not formally charged with any crime until after the police took his recorded statement at the police station.

Nevertheless, after hearing the parties' arguments, the court issued a bench decision denying defendant's motion to suppress his statement, admitting the statement subject to certain redactions. The court found the State had proven beyond a reasonable doubt that defendant was advised of his rights, and that he knowingly, intelligently, and voluntarily waived them without any indication his

statement was made due to coercion, official misconduct, or mental or physical impairment.

The court further held that defendant's post-arrest statement to the police at the ice cream parlor, identifying the seized cellphone as his, was admissible because the police seized the cellphone pursuant to a search warrant; Mackafee's question to defendant if the cellphone found on him, "was not meant to elicit an incriminating response"; and defendant's admission that the cellphone was his was not criminal in nature.

We see no reason to disturb the court's admission of defendant's recorded statement based on his assertion it was involuntarily given because the detectives had him wait alone in the interrogation room for thirty-eight minutes before being questioned. There is no indication defendant was physically or mentally uncomfortable or exhausted. Defendant also cites no case law to support this argument.

Defendant's statement at the time of arrest, however, is disconcerting. The search warrant permitted a search of defendant's premises and to seize and search his cellphone but not his person. Thus, absent some exception, the warrant requirement applies. See State v. Bivins, 226 N.J. 1, 16 (2016). Defendant was not free to leave while the search warrant was executed. See

Bailey v. United States, 568 U.S. 186, 199 (2013); Michigan v. Summers, 452 U.S. 692, 705 (1981). Mackafee testified that although he placed defendant under arrest after the execution of the search warrant, there were no formal charges brought against defendant until after he gave his recorded statement at the police station.

In a lawful search incident to defendant's arrest, Mackafee discovered a cellphone on defendant's body. See State v. Minitee, 210 N.J. 307, 318 (2012) ("When the police place an individual under arrest, they may search his person and the area within his immediate grasp."). Mackafee seized the cellphone and asked defendant if the cellphone belonged to him, and defendant responded that it did.

Once defendant was arrested, Mackafee was required to issue Miranda warnings before any interrogation commenced. State v. O.D.A.-C., 250 N.J. 408, 412, 420 (2022). But the record indicates defendant was not read his Miranda rights until he was later questioned at the police station. Hence, Mackafee's asking defendant if the seized cellphone was defendant's and defendant's admission that it was violated defendant's Miranda rights because the cellphone was believed to contain incriminating information. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (questioning by police that is

"reasonably likely to elicit an incriminating response from the suspect" constitutes an interrogation under Miranda). Indeed, defendant's admission was used at trial to establish the cellphone was his.

We thus conclude the court mistakenly applied its discretion in admitting defendant's statement concerning the cellphone. However, this error was harmless because even without his statement, the overwhelming evidence established the cellphone belonged to defendant. Not only was defendant's cellphone seized from his person, but it also contained text messages to and from him, including with the victims, identifying him by name, and photos taken from the video recordings found in his office, which he kept locked with a key seized from him. Indeed, there was overwhelming evidence of defendant's guilt independent of any evidence found on the phone: the seizure of the hidden camera, the camera's recordings, and the victims' testimony. See State v. Tillery, 238 N.J. 293, 302 (2019).

## VIII.

We do not address defendant's excessive sentence argument because, as noted, we vacate the convictions for five counts of second-degree endangering the welfare of a child and remand to the trial court to mold the jury's verdict to

convict defendant of five counts of third-degree endangering the welfare of a child. Defendant may raise this argument if after remand he appeals.

IX.

In his self-represented brief, defendant argues that the warrant to search his premises was invalid because the Vineland police allegedly altered the hours when the warrant could be executed. We denied defendant's ensuing motion for a limited remand to develop the record.

Before the trial court, defendant, through counsel, moved to suppress evidence obtained pursuant to the search warrant. R. 3:5-7. However, the record does not indicate defendant's current argument was raised before the trial court. Accordingly, defendant waived any right to assert this argument on direct appeal. R. 3:5-7(f); State v. Robinson, 200 N.J. 1, 18-22 (2009).

To the extent we have not specifically addressed any of defendant's arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION